CORA WILLIAMS, EX. *vs.* MAYNARD S. WILLIAMS.

Knox.    Opinion December 4, 1912.

*Burden of Proof.   Checks.   Dividend.   Explanations.   Experts.   Error.*
*Exceptions.   Forgery.   Genuineness of Signature.   Handwriting.*
*Microscope in jury room.   Payment.   Settlement.   Standard*
*of Handwriting.   Signature.   Writing.*

This is an action of trover brought by Cora Williams, Executrix of the last will and testament of Warren G. Williams, to recover from the defendant the sum of $18,750, with interest. The testator, Warren G. Williams, Maynard S. Williams, the defendant, and Mrs. Mary J. Forhock were the children of Timothy Williams, and as his heirs at law were the owners in common of a lime quarry in Rockland, which in March, 1900, was sold and conveyed to the Rockland-Rockport Lime Company for the sum of $56,250, one-third of which belonged to each of the above named heirs. The entire purchase price of $56,250 was paid to Maynard S. Williams, and by him deposited with Kidder, Peabody & Co., of Boston, with the consent of his brother and sister. Warren G. Williams died in 1910, testate, and this suit is brought by his wife, the executrix, who claims that the defendant never paid over to her husband the portion that was due him.

The defendant claims that he paid the testator in full, one-half $9,375 on September 10, 1901, and the remaining half, $9,375, on April 18, 1903.

In support of his contentions, he presents two receipts purporting to be signed by Warren G. Williams bearing the above dates and for the above amounts.

The plaintiff claims that the above two receipts are forgeries.

The dividends on the amounts so deposited the defendant paid to his brother and sister in checks, but he claims to have paid to his brother his $18,750 in money at the two times mentioned in the receipts, at his brother's request.

*Held:*

1.  That a careful study of the entire testimony fails to find the explanation satisfactory or convincing; on the contrary, it lacks the elements of credibility.

2.  That the transactions, as related by the defendant, are possible, but seem hardly probable. They are so at variance with the usual course of business transactions as to be well nigh inherently incredible.

3.  An inspection of these two receipts themselves, without comparison with any other standard, arouses suspicion. The two blank forms used used are identical, the same paper, the same printing. The written por-

tions of the body are as nearly identical as the human hand could make them. The ink is apparently the same, the handwriting the same. In fact the two receipts are so similar in form and substance that it seems impossible that one was written on September 10, 1901, and the other on April 18, 1903.

4. The signatures "Warren G. Williams" are practically identical. Their appearance would indicate strongly that they were prepared at one sitting.

On motion and exceptions by plaintiff. Sustained.

This is an action of trover by the executrix of the last will and testament of Warren G. Williams to recover from the defendant the sum of $18,750, with interest. Warren G. Williams, Maynard S. Williams and Mrs. Mary J. Frohock were the children of Timothy Williams, and as his heirs at law were the owners of a certain lime quarry in Rockland, which, in March, 1900, was sold and conveyed to the Rockland-Rockport Lime Company for the sum of $56,250, one-third of which belonged to each of the three heirs. The entire amount of the $56,250 was paid to defendant and deposited in his name with Kidder, Peabody & Co., with the consent of his brother and sister. The defence is payment evidenced by two receipts purporting to have been signed by Warren G. Williams, but which the plaintiff claimed were forgeries. Plea, general issue with brief statement of statute of limitations. The jury returned a verdict for the defendant. The plaintiff filed a general motion for a new trial and exceptions. The case is fully stated in the opinion.

*A. S. Littlefield,* for plaintiff.

*L. M. Staples,* for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, JJ.

CORNISH, J. This is an action of trover brought by the executrix of the last will and testament of Warren G. Williams to recover from the defendant the sum of $18,750 with interest. A verdict having been rendered for the defendant the case is before the Law Court on motion and exceptions by the plaintiff.

The following facts are practically conceded.

The testator, Warren G. Williams, the defendant Maynard S. Williams and Mrs. Mary J. Frohock were the children of Timothy

Williams and as his heirs at law were the owners in common of a certain lime quarry in Rockland which in March 1900 was conveyed to the Rockland-Rockport Lime Company for the sum of $56,250, one-third of which belonged to each of the three heirs.

The entire purchase price was paid to the defendant who was the active agent in making the sale, and on March 19, 1900, was deposited by him in his own name with Kidder, Peabody & Co. of Boston, with the full consent of his brother and sister.

Warren G. Williams died testate in 1910, and this suit is brought by his wife, the executrix, who claims that the defendant never paid over to her husband the portion that was due him, and seeks to recover the same with interest, while the defendant claims that he paid the testator in full, one-half, $9,375, on September 10, 1901, and the remaining one-half, $9,375, on April 18, 1903. In support of his contention he presents two receipts purporting to be signed by Warren G. Williams, bearing those dates and for those amounts. The plaintiff replies that these receipts are forgeries. Here is the issue.

*Motion.*

The $18,750 belonging to Warren G. Williams, having been admittedly received by the defendant the burden rested upon him to prove its payment to the owner.

His story is this, that he deposited the entire $56,250 with Kidder, Peabody & Co. in his own name by agreement with his brother and sister, and received interest thereon at rates varying from 2 to 4%, the dividends being paid to him semi-annually and then checks were sent by him to his brother and sister for their respective shares; that the first half of the principal, $9,375, was paid by him to his brother on September 10, 1901, at his sister's home in Rockland, and in her presence, and was paid in money at Warren's request because, to use his own words; "he said he wanted it in cash, bills or money, and not checks or bonds or anything of that nature," and the first receipt was given at that time.

His explanation of having so large an amount of bills on hand is that he had drawn about twelve thousand dollars in cash in November, 1900, from Kidder, Peabody & Co., and had drawn it partly with the idea of meeting this claim;

That subsequently Warren requested payment of the remaining $9,375, and again they met at Mrs. Frohock's house, on April 18, 1903, and again at Warren's request he paid him the full amount in bills of large denomination and Warren put them in his pocket and went away. He accounts for the possession of so large an amount of cash on the second occasion by saying that he had purchased twelve thousand dollars worth of bonds of Kidder, Peabody & Co. in January, 1903, and had turned over eight or nine or ten thousand of them to his sister for which she had paid him in bills and it was these same bills that he had kept on hand until April 18th, 1903, when he made this final payment to his brother and took the second receipt;

That after that second payment Warren never mentioned the quarry matter to him nor informed him of what he had done with the money nor how he had invested it.

The sister corroborates the defendant in a large part of his testimony especially as to the cash payments made to Warren in her home, and this with the two receipts, the genuineness of which is seriously denied, makes up the defendant's explanation.

After a careful study of the entire testimony we fail to find this explanation satisfactory or convincing; on the contrary it lacks the elements of credibility.

The transactions, as related by the defendant, are possible but they seem hardly probable. They are so at variance with the usual course of business as to be well nigh inherently incredible. The drawing of twelve thousand dollars in cash from the bankers in November, 1900, and keeping it on hand in order to pay Warren the $9,375, ten months later, in September, 1901, and that too, when, as the plaintiff testifies on cross-examination, Warren did not ask for the payment until two months before it was made, or about July, 1901, overtaxes one's credulity. The idea of keeping that large amount of money in idle bills for so long a time to meet a claim that had not as yet been made lacks reasonableness.

Then too, every other payment during all the progress of this business had been made by the defendant in checks. He apparently knew their value as receipts, and when the rent of the quarry had been received by the defendant prior to the sale, he had remitted to the plaintiff and his sister checks for their share. According to his

own statement after the sale and before the payment of the first half of the principal, that is from March, 1900, to September, 1901, he had used checks with which to pay the plaintiff his share of the earned dividends and between the payment of the first half and of the second, that is between September 10, 1901, and April 18, 1903, he continued to pay the plaintiff his dividends on that remaining half in checks. They lived in the same city and only a mile and a half apart, but these business transactions between them were conducted in the usual way. The defendant paid by check and Warren apparently received the checks without objection.

Yet when it came to the payment of nine thousand three hundred and seventy-five dollars on two occasions, making a total of eighteen thousand seven hundred and fifty it was counted out in bills. From the standpoint of both the man who made the payment and the man who received it, checks would seem to have been not only the natural but the necessary form of payment.

The second payment is in the same category. The cash which he used in this payment he says he obtained from his sister as the price of certain bonds that he sold her; that she paid him in cash at her house, that he does not know where she obtained the bills but that he took them and placed them in his safety deposit box at the Rockland Trust Company and kept them there until he made the second payment in April, 1903. This involves two cash payments of nine thousand dollars or more; the one from the sister to the defendant and the other from the defendant to Warren, and that too although he had not asked his sister to pay him in cash, a most unnatural transaction.

It may be that the defendant attempted to connect his alleged payments with two checks drawn by him on Kidder, Peabody & Co., the first on November 6, 1900, for $12,418.56, and the second on January 19, 1903, for $12,403.50, the only two large amounts drawn from that account prior to April, 1903, but the first of these shows that it was drawn to the order of J. R. Frohock, and has no connection with Warren. It may have been in part payment of Mrs. Frohock's share, while the second appears in the account merely as a draft. Outside of these two withdrawals, the other withdrawals from Kidder, Peabody & Co., excluding a purchase and sale of some United States bonds that appear on both sides of

the account and do not affect it, aggregate only $4,184.89, between the. time of first deposit and the alleged final settlement.

The question naturally arises therefore, from what source did the defendant obtain his money to make the payments.

Again, these two receipts represent only the principal. What of the accrued interest? The defendant says he paid it as it accrued, but on April 18, 1903, there must have been interest due from January 1, 1903, and that did not enter into the settlement. Would it not have done so, if a final settlement was then made. We have simply two naked receipts each for exactly one-half the principal. All these suggestions arise so naturally from the circumstances and probabilities that they cannot be ignored in attempting to reach the truth.

. It is further in evidence that Warren was a day laborer all his life, industrious and frugal. There was never any outward sign of his having received what to him would have been a fortune. His dealings with the traders disclose a man of very moderate means. He had about seven thousand dollars in bonds that apparently came from some other portion of his father's estate, but there is no evidence of any investment or deposit or use of the large amount in controversy which the defendant says he paid him. All this is significant.

On the other hand however, it should be said that Warren was married in 1903 to the plaintiff and that there is no evidence of any demand being made upon the defendant for payment until after Warren's decease in 1910. The relations of the two brothers apparently continued friendly.

This brings us to the two receipts, the genuineness of which is in dispute.

The plaintiff attacks them as forgeries, not free hand imitations but tracings from some genuine original.

An inspection of these two receipts themselves, without comparison with any other standards arouses suspicion. The two blank forms used are identical, the same paper, the same printing. The written portions of the body are as nearly identical as the human hand could make them, with the exception of one or two words. The ink is apparently the same, the handwriting the same. In fact the two receipts are so similar in form and substance that it seems

impossible that one was written on September 10, 1901, and the other on April 18, 1903. Their appearance would indicate strongly that they were prepared at one sitting.

When we come to the signatures, "Warren G. Williams" these too are practically identical. It must of course be remembered in this connection that Warren could not read, and could write nothing except his name. He had learned to do this in a mechanical way, so that an unusual similarity in his signatures might be expected. But the similarity here is more marked than even that. There is some variety in the signatures introduced as standards of comparison especially when superimposed, but these two, when one is superimposed upon the other, correspond in practically every detail, a correspondence not to be expected when they were written more than a year and a half apart. Moreover the experts for the plaintiff testified that the ink on the two receipts was identical in color and analysis, that it was of practically the same age and when compared with the same kind of ink in signatures nearly ten years old and admittedly genuine, the latter had a dark, thoroughly rusted, burnished red appearance as they should have at that age, with an elimination of black or blue, while the ink on these two disputed receipts was of "a fairly bright methylene blue color, with no rusty appearance, only a dullness, the blue still prominent."

In other words if these receipts had actually been written at their purported dates in 1901 and 1903, the ink should have the appearance of ink of that age, while in fact it had the appearance of being recently used.

This expert evidence is corroborated by the positive testimony of the Judge of Probate and the Register of Probate who noted the freshness of the ink when these receipts were first presented in the Probate Court and the change from a blue black to a darker color, with a loss of the fresh appearance and a taking on of a dullness, within a comparatively short time, changes that could not have taken place, between the two inspections had the receipts actually been written about ten years before.

It is true that the defence presented two experts, the same number offered by the plaintiff, who testified that in their opinion the signatures to the receipts were genuine, but their attention seems to have been directed more to the question of forgery by imitation

than by tracing; so that the very similarities which would indicate genuineness from the former standpoint might tend to prove forgery from the latter. Nor did they make any analysis or test of the ink, or attempt to controvert the convincing testimony of the plaintiff's witnesses on that point.

Without going into further detail it is sufficient to say that it is our opinion from the testimony, the exhibits, the circumstances and the probabilities that the verdict in this case was so clearly wrong as to indicate bias or prejudice on the part of the jury, or failure to appreciate the facts, and for that reason it cannot be allowed to stand.

*Exceptions.*

These should be briefly considered because the same questions may arise if this case is tried again.

1. The exclusion of the testimony of Herbert L. Ulmer tending to show that Warren G. Williams borrowed small sums from him during the past ten years. We think this testimony was legally admissible as having some tendency to show the financial condition of Warren, its weight being for the jury. But inasmuch as other witnesses, such as traders, were permitted to show the manner in which Warren carried small accounts at their stores and paid in installments, which was evidence tending to prove the same general condition, we do not think the exclusion of Ulmer's evidence constituted prejudicial error.

2. The exclusion of the testimony of Merritt A. Johnson, an attorney, who was employed by Warren after these alleged payments, and was asked what he did by virtue of that employment. It is not contended that anything done was brought to the attention or knowledge of the defendant. It would be at the most a self serving act and the evidence was properly excluded.

Johnson was further interrogated as to a trip with Warren to the Pan American Exposition in October, 1901, immediately after the first alleged payment, and stated that the trip was under consideration for two or three weeks but Warren did not decide to go until the day before they started. Being asked, "What was the reason that it was not earlier decided" and "had you delayed your going for any reason on account of Mr. Williams," the answers were excluded.

We think there is no error here. The evidence sought so necessarily involved either the opinion of the witness or some declaration of Warren that it was properly excluded.

3. The exclusion of expert testimony offered by the plaintiff to prove to the Court that certain exhibits offered by the defendant as standards of the handwriting of Warren were not themselves genuine.

Whatever the rule may be in other jurisdictions the general rule adopted in this State is that when the genuineness of handwriting is in question it may be proved by comparison with other handwriting of the party sought to be charged, admitted or proved to be genuine; that such writing is admissible as a standard for the purpose of comparison whether relevant to the issue or not; that before it can be admitted as a standard it must be proved or admitted to be genuine, that the question of its admissibility as a standard is to be determined by the presiding Justice, and exceptions to its admission will not be sustained unless it clearly appears that there was some error in law or that the evidence was admitted without proper proof of the qualifications requisite for its competency. *State* v. *Thompson,* 80 Maine, 194.

The Massachusetts court has adopted the same rule as in this State, that exceptions will not lie to the findings of the presiding Justice unless his decision is founded upon error in law or upon evidence which is as a matter of law insufficient to justify the findings. *Nunes* v. *Perry,* 113 Mass., 276, *Costello* v. *Crowell,* 139 Mass., 590, cited in *State* v. *Thompson,* supra.

In other words the genuineness of the standard is a preliminary question of fact to be determined by the presiding Justice and its admissibility as a standard is a matter within his discretion. This does not mean, however, an arbitrary exercise of power, which is sometimes termed an abuse of discretion. To illustrate: "Whether a witness called as an expert possesses the necessary qualifications to enable him to testify is a preliminary question to be decided by the court. That decision must be final and conclusive unless it is made clearly to appear from the evidence that it was not justified or that it was based upon some error in law." *Marston* v. *Dingley,* 88 Maine, 546. So in cases of handwriting, "proper proof" of the qualifications requisite for the competency of the standard must be

adduced to the court. Great consideration must necessarily be given to the decision of the presiding Justice, but the question remains, what is "proper proof" or "evidence sufficient in law" and "when can it be made to appear that "the ruling was not justified by the state of the evidence as presented to the Judge at the time," all of which tests have been recognized by the courts of Massachusetts and Maine?

The general rule is that "it may be proved by any person who has acquired a knowledge of the handwriting by having seen the party write, or from having carried on a correspondence with him, or, as decided in Hammond's case, 2 Maine, 32, from having seen handwriting acknowledged or proved to be his." *State* v. *Thomson,* supra.

Applying these principles to the precise point at issue, we find the situation to be this: Several specimens of Warren's signature were introduced by both plaintiff and defendant, which were admitted to be true and were therefore accepted as standards. The defendant offered certain other specimens, to the admission of which the plaintiff objected on the ground that they were not genuine. Thereupon, the court put this question to the defendant:

"Q. The question is, examine those papers, Nos. 13 to 27, the signatures of Warren G. Williams, and state whether in your opinion, it is his genuine handwriting."

"A. I should say they were."

"The Court. I will admit them. Whether they are or not we will see afterwards."

Some discussion followed between court and counsel as to withdrawing these exhibits, but they were not withdrawn. The plaintiff then offered an expert in handwriting to state whether in his opinion the party who wrote the admitted standards, wrote the signatures on these exhibits No. 13 to 27, and whether he had any way of demonstrating the grounds of his belief. This evidence was excluded and exceptions reserved.

So that, the presiding Justice while deciding that the question of the genuineness of the offered standards was a matter for his determination alone, heard the opinion of the defendant himself, but declined to hear expert evidence to the contrary.

It is the opinion of the court that this evidence should have been received. While mere expert evidence may not be sufficient alone to establish the genuineness of a standard, under the decision in *Commonwealth* v. *Tucker,* 189 Mass., 457-472, yet it does not follow that it should not be heard by the presiding Justice when offered to attack the genuineness, *Costello* v. *Crowell,* 133 Mass., 352, especially when the only evidence of that genuineness is the opinion of the defendant himself, uncorroborated, the party who is claiming under the alleged forged receipts.

The source being somewhat open to suspicion, we think the other side should be allowed to offer any competent evidence, including expert, to meet the claim, and that "the ruling was not justified by the state of the evidence as presented to the Judge at the time."

This exception should be sustained.

4. Refusal of the presiding Justice to allow the jury to make examination with the microscope, used by one of the experts, who testified as to the results of his examination.

This is largely a matter of discretion with the presiding Justice, and while it is customary to permit the jury to use such an aid in the investigation of the facts, we are not prepared to say that the refusal to do so in this case was reversible error.

5. The court after explaining the statute which prevents the defendant from testifying unless the plaintiff, as a representative party had testified, used this language. "Therefore in law the defendant became a competent witness and his testimony is entitled to as much weight as you find it entitled to, and you should not detract from it on account of his being an adverse party to the estate because the plaintiff has waived that rule." This may not have accurately expressed the meaning of the court, but as it stands it practically says to the jury that they are to make no allowance for the fact that the defendant is an interested party with interests adverse to the plaintiff. It was an incorrect statement of the rule by which the defendant's evidence was to be weighed, and its effect may have been harmful.

It is unnecessary to consider the other exceptions, many of which are of minor importance.

The conclusion of the court is that the entry should be,

*Motion and exceptions sustained.*