ANCIL S. YOUNG

*vs.*

HORNBROOK INCORPORATED

Aroostook. Opinion, April 14, 1958.

*Gerald L. Keenan,*
*Asa H. Roach,* for plaintiff.

*Roland A. Page,*
*George B. Barnes,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ. BELIVEAU, J., sat at argument but retired before the opinion was adopted.

WILLIAMSON, C. J. This is an action in assumpsit to recover a balance allegedly due from defendant under a written contract to pay one cent per square foot for grading and seeding land at the Limestone Air Force Base. The case is before us after verdict for the plaintiff on exceptions by the defendant to the exclusion of certain testimony and on general motion for a new trial.

The controversy centers (1) about the area in square feet for which payment is due, and (2) about the meaning of the written contract, and in particular whether "mulching" was included in the obligation of the plaintiff.

We state the pertinent evidence without detail. On April 26, 1954, the plaintiff and the defendant entered into a written agreement, providing in part as follows:

"The Sub-contractor (the plaintiff) agrees to furnish lime, fertilizer, and grass seed, and to finish grade from a bulldozer finish and seed down all area requiring such finish grading and seeding in

accordance with plans and specifications of a construction contract which the Contractor (the defendant) now has at Limestone Air Force Base.

"Contractor agrees to pay Sub-contractor therefor at the rate of $0.01 per square foot for all land so graded and seeded; payment to be made as work progresses, according to regulations customarily included in such government contracts, with 90% of the contract price upon completion, and the remaining 10% upon final approval by the Army Corps of Engineers."

The "construction contract" at the Air Base referred to above was the contract between Consolidated Constructors, Inc. and the defendant, from which it appears that Consolidated in turn had a contract covering the work in question with the United States Government. The record also includes pertinent extracts from the Government specifications on "Turfing" and on "Quantity Surveys." The parties are in agreement that the contract between the plaintiff and defendant included the Consolidated contract and the specifications.

The plaintiff completed, so he says, his contract at the Base and was paid $5300 on account. There is a substantial difference between the measurements of the areas involved on the evidence offered by the plaintiff and by the defendant.

On his part the defendant contends that the parties are bound by the measurements found by the representative of the Government. He also says that he is entitled to reduce any amount due from him on the square foot basis by the cost of mulching certain areas. The question on this point is whether mulching was called for by the contract. If so, the evidence offered of mulching and its cost was erroneously excluded. In addition, the defendant also seeks to reduce the claim by certain charges for gasoline and for reseeding in the "bomb storage" and "officers' mess" areas.

It may be noted that the defendant admittedly owed a balance under the contract. The jury found the full amount claimed by the plaintiff, adopting his measurements and denying the claims of the defendant.

## EXCEPTIONS

The exceptions are mainly directed to the exclusion of expert evidence to show that mulching of seeded slopes was the general practice, good practice, and necessary for a good workmanlike job of seeding. The exclusion was on the ground that the evidence was not material for the reason the contract did not, by express terms, require mulching. The question is not whether expert evidence as distinguished from other evidence was admissible to interpret the contract.

The test to be applied by the trial judge in a situation such as this is whether the written contract has a plain meaning. If so, parol evidence of meaning is not admissible. In placing their agreement in written words, contracting parties are held to the plain meaning thereof.

Let us take the contract between plaintiff and defendant step by step to ascertain, if we may, the plain meaning from the words used, or whether evidence may be introduced under the rule to interpret the language of the contract on the issues here in dispute. *Haskell* v. *Tukesbury*, 92 Me. 551, 43 A. 500; *Fenderson* v. *Owen*, 54 Me. 372; *Emery* v. *Webster*, 42 Me. 204; 9 Wigmore, Evidence Sec. 2461 *et seq* (3d ed.) ; 3 Williston, Contracts Sec. 609 (rev. ed.) ; 32 C. J. S., Evidence Sec. 959, p. 896.

> "Where the language employed in a contract has an ordinary meaning or where the meaning is plain and unambiguous when read in connection with other provisions of the contract, extrinsic evidence as to its meaning is not admissible." 20 Am. Jur., Evidence Sec. 1143.

"Whenever the terms of a contract are susceptible of more than one interpretation, or an ambiguity arises, or the extent and object of the contract cannot be ascertained from the language employed, parol evidence may be introduced to show what was in the minds of the parties at the time of making the contract and to determine the object on which it was designed to operate." 20 Am. Jur., Evidence Sec. 1147.

"The principle which governs the admissibility of extrinsic evidence explaining the meaning of a contract, denying the admissibility of such evidence when the meaning is plain and unambiguous, but permitting such evidence to be introduced when a contract is susceptible of more than one interpretation or where an ambiguity arises or the extent and object of the contract cannot be ascertained from the meaning of the language employed, in general governs the admissibility of extrinsic evidence of a usage or custom which it is asserted affects the rights and obligations of parties to a written contract or other written instrument." 55 Am. Jur., Usages and Customs Sec. 30.

We turn to the provisions of the contract from which we have quoted above. The plaintiff subcontractor agrees "to furnish lime, fertilizer, and grass seed, and to finish grade . . . and seed down . . . in accordance with plans and specifications of a construction contract . . ." The price is $0.01 per square foot "for all land so graded and seeded; . . ." We find no reference whatsoever to "mulch" or "mulching" in the language used by the parties.

Our next step is to examine the contract between Consolidated and the defendant covering certain "clearing, excavation and grading work in accordance with the plans and specifications . . ." of the general contract between Consolidated and the Government. The plaintiff's position as a subcontractor under the defendant for only a small portion of defendant's contract with Consolidated is shown by the fact that, on the plaintiff's figures, his contract totaled under

$10,000 of the $198,000 involved in the Consolidated contract.

The control exercised by the Government is evidenced by the following provision in the Consolidated contract:

"The Subcontractor (the defendant) shall be bound by the decision of those authorized by the General Contract as to the meaning of any of the plans, specifications, details and contract provisions which affect the work hereby let to the Subcontractor. All the General Conditions of the specifications insofar as they pertain to the labor and materials necessary to perform this Subcontract, are all made a part hereof as if herein set forth in full."

In the specifications entitled "Turfing" are detailed provisions for materials, inspections and tests, preparation of turfing areas, topsoiling, seeding, sodding, compacting, mulching, establishment, repair, cleanup, measurement and payment.

We are concerned obviously with only those specifications which touch upon the contract between plaintiff and defendant. For example, there is no suggestion that the specifications for "sodding" are applicable.

We cannot within the reasonable limits of an opinion set forth in detail the pertinent provisions of the specifications which in their entirety cover twenty-two pages in the record. From our examination we are convinced that seeding and mulching under the specifications (and thus under the plaintiff's contract) are separate and distinct processes, and that the former in this contract at least does not include the latter. There are detailed provisions for seeding and mulching, of which the following are of interest. "MULCHING.—Upon completion of the final rolling of seeded areas the surface of such areas shall be protected by the application of a top mulch."

The distinctive nature of mulching under the contract is further evidenced in the specification on Measurement and Payment. Under the Government contract with Consolidated, areas indicated to be topsoiled and seeded are measured by the square yard with the price including certain costs and specifically mulching. Areas to be "seeded only" are measured by the acre with the price including certain costs without the mention of mulching.

We conclude that seeding and mulching are plainly distinguished in the specifications and hence in the plaintiff's contract. The term "seeding" thus has a plain meaning to the extent at least that the meaning was challenged by the defendant. In short, the contract plainly does not include mulching. The offered evidence was properly excluded and the exceptions on this point are overruled.

The remaining exception was taken to the exclusion of testimony of the vice president and defendant's foreman on the job of the number of square feet seeded in the "bulk storage area." From the record it appeared the witness watched the surveyor take measurements and together with the surveyor made the necessary computations.

The plaintiff's witnesses placed the "bulk storage area" at 3,124 square feet; the government representative (whose figures were accepted by the defendant) at 3,368 square feet. The jury found the smaller area. It is at once apparent that the defendant suffered no harm whatsoever from the ruling. Accordingly, on well established principles, the exception is overruled. In doing so, we have not considered the merits of the exception and in no way do we intimate any view thereon.

## MOTION

The motion for new trial raises the question of whether the measurements found by the jury were against the evi-

dence and against the weight of the evidence. The jury returned a verdict for the plaintiff apparently reached in this manner:

| | |
|---|---:|
| 925,556 square feet @ $0.01 (plaintiff's claim) | $9,255.56 |
| Less agreed payments | 5,300.00 |
| Balance | $3,955.56 |
| Interest | 119.64 |
| Verdict | $4,075.20 |

The defendant admits there is due the plaintiff $1,364.68, arrived at as follows:

| | | |
|---|---:|---:|
| 772,560 square feet @ $0.01 | | $7,725.60 |
| Less agreed payments | | 5,300.00 |
| | | $2,425.60 |
| Less credits for gasoline | $   4.81 | |
| Cost replacement unsatisfactory work | 355.48 | |
| | $360.29 | |
| Mulching expense | 700.63 | |
| | | $1,060.92 |
| | | $1,364.68 |

We will dispose of the claimed credits at the outset. The items totaling $360.29 were before the jury and the jury found adversely to the defendant. They presented an everyday jury question. The defendant cannot now complain of the jury finding on this score.

The mulching item was considered in the exceptions. Evidence of mulching and of its cost was excluded, and not before the jury, and so cannot be considered in passing upon the motion.

Returning to the issue of area "graded and seeded," we show the different claims in the following table:

(Quantities are in square feet)

| Description area | Quantities Paid for by Prime Contractor according to figures of Corps of Engineers. | Quantities Billed to Defendant by Plaintiff in Dec. 1954. | Quantity claimed by Plaintiff in his writ May 1955 and found by Jury. |
|---|---|---|---|
| Diesel Electric Plant & Corps of Engineers' Bldg. | 34,967 | 34,967 | 55,286 |
| Sewage Disposal | 25,000 | 45,045 | 71,634 |
| Bulk Storage | 3,368 | 3,124 | 3,124 |
| Officers' Mess | 10,187 | 10,187 | 10,187 |
| Igloos & Barricades | 77,013 | 151,806 | 153,705 |
| Bomb Storage | 622,025 | 631,620 | 631,620 |
| Square feet | 772,560 | 876,749 | 925,556 |

The defendant would have the measurements determined between the plaintiff and the defendant by the Corps of Engineers. In other words, he urges that the findings of area under the contract between Consolidated and the Government are adopted by the plaintiff and defendant under their subcontract.

It appeals to one's sense of orderliness in business that this should be so. The Government pays the contractor (here Consolidated) for the work. Certainly it would be simpler for all concerned if the basis of the payment, in measure of work, could be used down the line of subcontracts.

The contract in this instance, however, in our view does not so provide. First, there is no such condition in words in the agreement signed by the plaintiff and defendant. Area, that is the square footage under the agreement quoted above, is determined by proof and not by a third party. Second, the provision of the specifications forming a part of plaintiff's contract and hitherto discussed do not provide for acceptance by the plaintiff of the Government measure.

The specification reads:

"SC-25. QUANTITY SURVEYS. -- a. The contractor will furnish all personnel, except chief of parties and instrument men, equipment and material required to make such surveys as are necessary to determine the quantities of work performed or in place. Chief of parties, and instrument men will be provided by the Government at no expense to the contractor. All original field notes, computations, and other records taken by the contractor for the purpose of quantity surveys shall be furnished promptly to the representative of the Contracting Officer at the site of the work; they shall become the property of the Contracting Officer and shall be used to the extent necessary in determining the amounts of payments due to the contractor under the article of the contractor entitled 'Payments to Contractors.'

"b. Unless waived in each specific case, quantity surveys shall be made under the direction of a representative of the Contracting Officer."

It is unnecessary for us to determine the weight to be given the quantity surveys in the settlement between the Government and Prime Contractor (Consolidated). The parties here it must be remembered are two subcontractors. Lying between the plaintiff and the Government are the defendant and Consolidated, both charged with performing the work included in the plaintiff's subcontract. Consolidated and the Government participate in the quantity surveys, but the plaintiff and defendant do not necessarily do so. In our view it would stretch the meaning of the quantity survey provision beyond its plain limits to hold it binding upon one not directly concerned therewith. We may well ask why, if it was intended for the plaintiff to be bound thereby, a provision to such effect was not placed in his contract with the defendant.

The jury was not compelled in our view to accept the quantity surveys made under the Government contract. Hence the figures in the first column of the table do not mark the limits of the defendant's liability.

The differences of consequence between the figures of the Corps of Engineers and the plaintiff's claim lie in the Diesel Electric Plant, Sewage Disposal, and Igloos and Barricades items. There are also substantial increases in the claims of plaintiff between the bill rendered in December 1954 and his writ in the Diesel Electric Plant and Sewage Disposal items.

The plaintiff introduced evidence of measurement of the several areas. Explanation was offered that the increase in amount claimed in the writ arose from errors made in preparing the December bill.

The widest difference between the parties is in the item for Igloos and Barricades, which for our purposes were man-made mounds to be "seeded down." The plaintiff offered evidence in some detail of the methods used in arriving at his figures and pointed out that the Igloos and Barricades had sloping surfaces and contained more area for grading and seeding than a flat surface. It is suggested there that certain areas appear by error in both Igloos and Barricades and Bomb Storage. The evidence on this point, however, did not reach beyond guess or surmise, and in any event did not compel such a finding by the jury.

On the whole, although the evidence does not have the preciseness and definiteness desirable in a matter involving measurements of land areas, yet we cannot say that the evidence did not, under the general principles applicable to the motion, warrant the jury accepting the evidence of the plaintiff in preference to that of the defendant.

> "A new trial will not be granted unless the verdict is clearly wrong. Where there is evidence to support a verdict and there is nothing in the case which would justify the substitution of the judgment of the court, who did not see nor hear witnesses, for that of the jury who did, and it appearing that the parties have had a fair trial without prejudicial error in law, the verdict should not be

disturbed." *Bowie* v. *Landry,* 150 Me. 239, 241, 108 A. (2nd) 314.

See also *Fillion* v. *Allain,* 153 Me. 303, 137 A. (2nd) 377; *McNally* v. *Patterson,* 153 Me. 115, 135 A. (2nd) 281; *Turcotte* v. *Dunning,* 132 Me. 417, 171 A. 908; *Garmong* v. *Henderson,* 114 Me. 75, 95 A. 409.

The entry will be

*Exceptions overruled.*

*Motion for new trial denied.*