Michael F. TOWLE

v.

Robert P. AUBE.

Supreme Judicial Court of Maine.

Oct. 9, 1973.

Linnell, Choate & Webber by G. Curtis Webber, Auburn, for plaintiff.

Mahoney, Robinson, Mahoney & Norman by Lawrence P. Mahoney, Robert F. Hanson, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

The plaintiff, Michael F. Towle, sued the defendant, Robert P. Aube, to recover damages for personal injuries, the total loss of his car, some loss of wages, and for other personal property damage sustained in a collision with the Aube automobile at a multiple intersection in Lewiston, Maine, where Sabattus Street and Campus Avenue meet at an acute angle. Both parties were the drivers of their respective vehicle. The accident happened at approximately 1:00 o'clock in the early morning of August 27, 1967. Tried under our comparative negligence statute, 14 M.R.S.A., § 156,[1] the case was submitted to the jury upon special interrogatories, to which the jurors responded that the negligence of both parties was equal. Thus, the ensuing judgment was in favor of the defendant Aube. The plaintiff appeals and we deny the appeal.

Several points are raised on appeal, and, in order to appreciate fully the treatment given to these alleged claims of error, we should initially focus our attention upon the evidence presented to the jury. Hence, we summarily recite the events which brought the parties together that night.

Towle started out first. He had picked up his girl friend (his wife at the time of trial) on August 26, 1967, a Saturday, at about 7:30 p. m. in Lewiston and then drove to the home of Wayne and Rhonda Sanborn in Leeds, Maine. The future Mrs. Towle had a birthday coming up the next day and the group were out to celebrate her anniversary. Towle had two mixed drinks at the Sanborns. At approximately 9:00 or 9:30 p. m., which is about the time the Aubes started out for the Heathwood Inn in Lisbon, Maine, Towle, his future bride and the Sanborns were on their way to the Inn to continue the celebration. Towle had three or four more drinks there, before the party was back on the road toward downtown Lisbon Street in Lewiston, where the two men repaired to a tavern for a glass of beer while the women went out to buy cigarettes.

The Aubes, on the other hand, had left their home in Lewiston at about 9:30 p. m. Their destination was the Heathwood, where they met friends and stayed until 11:30 p. m. Aube also had several drinks at the Inn, but then went to the Steer House in Lewiston for a late meal, leaving the restaurant at about 12:45 a. m. The Aubes, on their way home from the restaurant, traveled East Avenue and turned left on Campus Avenue (Campus Avenue, East Avenue and Sabattus Street mark the boundaries of a built-up triangular portion of the City of Lewiston), and, immediately prior to the accident, had stopped for the red light at the multiple intersection, which was controlled by overhead traffic signal lights hanging over the center of the intersection.

Towle intended to bring the Sanborns to their home in Leeds and, in the process, returned from downtown Lisbon Street in Lewiston to East Avenue and traveled East Avenue directly to Sabattus Street,

---

1. 14 M.R.S.A., § 156, enacted by Public Laws, 1965, c. 424, at the time of this accident read as follows:

"§ 156. Comparative negligence

Where any person suffers death or damage as a result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that death or damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the jury thinks just and equitable having regard to the claimant's share in the responsibility for the damage.

Where damages are recoverable by any person by virtue of this section subject to such reduction as is mentioned, the jury shall find and record the total damages which would have been recoverable if the claimant had not been at fault and the extent to which those damages are to be reduced.

Fault means negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this section, give rise to the defense of contributory negligence.

*If such claimant is found by the jury to be equally at fault, the claimant shall not recover.*" (Emphasis supplied.)

where he turned left on Sabattus Street and was traversing the multiple intersection, where Campus Avenue and Sabattus Street intersect at an acute angle, when his car was struck on its left side by the Aube automobile.

At about the time Towle was converging toward the intersection, Officer Cimato of the Lewiston Police Department, to the observation of Aube who was waiting for the traffic light to change from its steady red position, approached the traffic signal control box on the corner and switched the mechanism from its steady control cycle to the flashing cycle.

What happened at that time is somewhat in conflict. Mr. and Mrs. Aube testified that the signal light for Campus Avenue traffic turned green and Mr. Aube then proceeded into the intersection, when, as he neared the mid-point in the intersection, the light turned to flashing red. Mrs. Aube's warning to look out for the approaching Towle automobile went to naught, being too late to permit avoidance of the collision. Towle testified that he never saw the Aube car and had a flashing yellow light at all times. Officer Cimato described how the lights operate when the switch is flipped from the steady cycle to the flashing cycle. It was his testimony that, upon the switching operation, there is a period of time, less than two seconds, when the signal will show no light whatsoever before it resumes its operation on the flashing cycle. Charles Kerr, an electrician who spends ninety percent of his working hours on traffic light systems and who was familiar with the lights at the intersection of Sabattus Street and Campus Avenue agreed with the officer that, if the light is green on Sabattus Street and red on Campus Avenue at the time the switching operation from automatic to flashing cycle is activated, there is a slight pause before the flash mechanism becomes operative, but he stated that the intermission is very short, the time lapse being measurable in a fraction of a second, at the most not more than one half of a second.

1. *Exclusion of evidence—leading question*

Mr. Sanborn, who had been called as a witness by the plaintiff, testified as follows in direct examination:

"Q. Okay. Now, as you were coming down Sabattus Street, let me direct your attention to that time. Was . . . did you notice anything about Mr. Towle's driving that seemed to you improper?

"A. *His driving wasn't improper at all.*

"Q. How about speed? Can you tell us how fast you were going?

"A. I couldn't tell you how fast, but it was no more than 30 miles an hour.

"Q. Was there anything about . . . did you have any feeling that Mr. Towle's drinking was affecting his driving at all?

[Defendant's counsel]

"I object, if the Court please.

[The Court]

"Well, that's excluded on that.

[Plaintiff's counsel]

"Q. From your observation was there anything about Mr. Towle's driving that seemed to be affected by his drinking?

[The Court]

"Well, that's still improper. This is your witness. You can't lead him. That's excluded." (Emphasis added.)

The exclusion of Mr. Sanborn's testimony respecting the effect, if any, which Towle's drinking of intoxicating beverages may have had on his driving, is the basis for the plaintiff's first point on appeal. He claims that the lower Court committed reversible error, when it ruled the question a leading one and sustained the objection to it.

■■ It is well settled the general rule is that on the direct examination of a witness, absent special circumstances,[2] leading questions are improper and should be excluded. And it is not error for the court to sustain an objection to a question the answer to which would be competent evidence, if the question is leading. Thatenhorst v. United States, 1941, 10 Cir., 119 F.2d 567; Hubbard v. State, 1967, 2 Md. App. 364, 234 A.2d 775; People v. Cross, 1968, 40 Ill.2d 85, 237 N.E.2d 437, cert. den., 393 U.S. 221, 89 S.Ct. 468, 21 L.Ed.2d 393; 98 C.J.S. Witnesses § 329; 3 Wigmore on Evidence, Third Edition, Sections 769, 770.

As stated in Audibert v. Michaud, 1920, 119 Me. 295, 111 A. 305:

> "The legitimate object of all examination of witnesses is the eliciting of the truth, and the danger which arises from so-called leading questions is not that the truth may thereby be extracted in an untechnical manner, but that the untrue may be stated by a witness who is either indifferent to his oath or overzealous in the cause and eager to adopt any suggestion made by the attorney although not in accordance with the fact."

The reason for the rule was well expressed in Parsons v. Huff, 1854, 38 Me. 137, at 141:

> "The end proposed in extracting testimony, is *to obtain the actual recollections of the witness* and not the allegations of another person, adopted by the witness and falsely delivered as his." (Emphasis supplied.)

2. RULE 43. EVIDENCE
    "(b) Scope of Examination and Cross-Examination. A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of the state or any political subdivision thereof or of a public or private corporation or of an association or body politic which is an adverse party, and interrogate him by leading questions and contradict and impeach him in

■ The determination of the point, whether a question is a "leading" one, is not always of easy solution. In a sense, every question has some "leading" feature to it, since it must invite the witness's attention to something. No specific formula can be given which will cover all situations, and for that reason rulings on the admissibility vel non of evidence purportedly elicited through "leading" questions are left to the sound judicial discretion of the presiding justice who can better assess the appearance and manner of the witness, the readiness or reluctance of his answers and thus is afforded a closer approach to the problem. "The presiding Justice who has an unprejudiced view of the entire situation is allowed a wide discretion in this respect." Audibert v. Michaud, supra.

■ The usual "leading" question is one by which the interrogator makes known to the witness the fact which he expects the witness to assert in and by his answer. Parsons v. Huff, supra, at 141. The question involved in this case was neutral on its face. Futhermore, it does not appear from the record that any particular emphasis was placed on any part of the interrogatory which affirmatively indicated to the witness what answer plaintiff's attorney expected. Even though it is plain to us, as it was to the witness, what answer counsel anticipated, nevertheless, we cannot say that it was a "leading" question subject to exclusion under the rule. This was no attempt by counsel to suggest facts the existence of which the question purports to have the witness characterize as true or false, a most common form of impermissible leading on direct examination.

all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief. A witness examined in chief only as to the signature to or execution of a paper may be cross-examined only as to such signature or execution."

We need not decide whether, as contended by the defendant, the evidence solicited by the reference question was inadmissible on the ground that the interrogatory called for an opinion of the witness respecting matter solely within the province of the jury to evaluate and we are not intimating any opinion concerning the same. An exclusion of evidence, even if wrongful, will not suffice to cause a reversal unless the party against whom the ruling is made is aggrieved or prejudiced by it. Prejudicial injury occurs only if the evidence excluded was relevant and material to a crucial issue and if it can with reason be said that such evidence, if admitted, would probably have affected the result or had a controlling influence on a material aspect of the case. Comstock v. Smith, 1843, 23 Me. 202; Guild v. Eastern Trust and Banking Company, 1926, 125 Me. 292 at 297, 133 A. 164; Urbani v. Razza, 1968, 103 R.I. 445, 238 A.2d 383. See also, Young v. Hornbrook, Incorporated, 1958, 153 Me. 412 at 418, 140 A.2d 493; Torrey v. Congress Square Hotel Co., 1950, 145 Me. 234 at 240, 75 A.2d 451; Merrill v. Milliken, 1905, 101 Me. 50, 63 A. 299.

In the instant case, the witness had testified that the plaintiff's driving "wasn't improper at all." This, in itself, impliedly conveyed to the jury that there was nothing about Mr. Towle's driving that seemed to be affected by his drinking. The excluded evidence would not be impressive with the jury and we believe would not have changed the result. The exclusion of such evidence, even if erroneous, did not constitute prejudicial error. See, Williams v. Williams, 1912, 109 Me. 537, 85 A. 43.

2. *Exclusion of evidence—absence of mental or physical disturbance—collateral issue*

The plaintiff's wife testified on direct examination that, just before the accident, as her husband was driving along Sabattus Street, he was operating the car at a normal rate of speed. She was then asked the following question:

"Q. Now, how would you describe yourself as a passenger? Are you serene and carefree, or what is your attitude as a passenger?"

After objection had been raised and sustained, Mrs. Towle testified, in the absence of the jury, and this was received in lieu of an offer of proof by counsel:

"A. Well, I'm nervous as a passenger. [By counsel]

"Q. How would you typically display that nervousness?

"A. Well, sitting on the passenger side, but helping the driver as far as, you know, like putting my foot, you know, down on the floor for the gas or the brake.

"Q. * * * how frequently are you likely to do this kind of thing in riding as a passenger?

"A. Most all the time.

"Q. Well now as you were proceeding down Sabattus Street, let's say from the time you turned on Sabattus Street until the time you got to the intersection, was there anything about the way Mr. Towle was operating his automobile which caused you to display this kind of nervousness that you've described?

"A. No."

Counsel for the plaintiff summed up his contention before the Court below in these words:

"Well, my position on this would be, your Honor, that the defendants have made a great deal of the fact that Mr. Towle was drinking, had been drinking previously in the evening, and have insinuated that this was affecting his driving. I'm simply trying to meet that by showing that the person who is here is a nervous rider, was riding with him, and there was nothing about the way he was driving, or operating his automobile which was causing her to have the nerv-

ous reaction she had on previous occasions which would have occurred had he been driving erratically."

■ There was no error in excluding this type of roundabout evidence to establish the fact that Mr. Towle's driving had not been affected by his drinking. The witness could have been asked whether Mr. Towle was under the influence of intoxicating liquors. It is fundamental law that, to be admissible, evidence must be both relevant and material. Thus, the issue precipitated by the reference objection is, whether the fact Mrs. Towle often experiences a nervous reaction while riding in a car, but did not have such physical sensations while her husband was driving on the night of the accident, has sufficient logical connection to her husband's condition of sobriety and exercise of due care at the time of the accident to be legally admissible relevant and material evidence.

■ Both relevancy and materiality depend on probative value. Legal relevancy requires more than mere logical relevancy. Indeed, it demands a close connection between the fact to be proved and the evidence offered to prove it; the evidence must have a legitimate tendency, albeit not conclusive, to establish the controverted fact. Materiality, on the other hand, goes to the weight of such evidence in helping to resolve the issue. See, Torrey v. Congress Square Hotel Co., supra.

■ We do recognize that natural mental and physical reactions such as ordinary sense perceptions and muscular or psychic activities of persons may be received in evidence to prove material conditions and qualities of objects which cause such reactions by the showing of specific instances of such effects. Analogically, we concede that there may be some relevancy between physical or mental reactions by reason of one's natural tendencies to avoid harm to one's self from motor vehicle operation, whether from the type of operation or the condition of the operator, in specific instances. In the instant case, however, the plaintiff sought to show, from the absence of any physical or mental nervous reaction of his passenger-wife, that his operation of the automobile at the time of the accident was proper and careful and that his driving was unaffected by his drinking. Such proof, at best, presents a marginal connection of logic in the deliberative process to determine cause and effect. It would tend to confuse the jury, rather than help them, in the discovery of the truth. Furthermore, the admission of such evidence would bring in a host of collateral issues to distract the attention of the jury from the real point, such as the witness's degree of nervousness, the specific events when she observed her reactions to motor vehicle operations in the past and the nature of the acts causing the same, also, whether her lack of nervous tensions was the result of her confidence in her husband's driving ability, etc.

"If evidence of this character is receivable, contradictory proofs would be admissible, and there would be as many collateral issues as there were collateral facts and witnesses testifying to them." Parker v. Portland Publishing Co., 1879, 69 Me. 173.

■ The determination of relevancy and materiality must necessarily rest largely in the sound discretion of the presiding Justice. McCully v. Bessey, 1946, 142 Me. 209, at 214, 49 A.2d 230, at 233. There was no abuse of discretion in the instant case.

3. *Requested instructions*

■ A. At the close of the evidence plaintiff's counsel requested the following jury instruction:

"I instruct you that if you find that the defendant Aube drove into the intersection from Campus Avenue at a time when the traffic control light had no light indication at all, he would nevertheless be negligent if he failed to

yield the right of way to a vehicle approaching from his right."

The proposed instruction was intended to inform the jury specifically respecting Mr. Aube's duty in connection with Mr. Towle's oncoming vehicle if the jury found as a fact that the signal lights had become inoperative for an appreciable period of time as Officer Cimato described they normally did on the switching operation from automatic to the flashing cycle. The propriety of the refusal to give this instruction is for decision on appeal. We need not decide the issue as tendered, as we find no showing of prejudice by reason of the presiding Justice's refusal to give the requested instruction. Thus, if there was error, it was not reversible error.

■ *A party is not entitled to have a requested instruction given, even if it states the law correctly, unless it appears* that it is supported by facts, that it is not misleading, that it is not already covered by the charge, and *that the refusal to give it would be prejudicial.* Desmond, pro ami v. Wilson, 1948, 143 Me. 262, at 268, 60 A. 2d 782; Pettengill v. Turo, 1963, 159 Me. 350, 193 A.2d 367; Davis Investment Company v. Cratty, 1928, 127 Me. 290, 143 A. 61.

■ The jury responses to the special interrogatories found both Mr. Aube and Mr. Towle negligent and equally at fault. Proper instructions were given on the general principles of due care and negligence. The presiding Justice may well have thought that to give the requested instruction would have unduly emphasized an insubstantial particular state of facts. Any amplification or illustration in the manner of applying the principles of law to the various aspects of the facts is a matter in the control of the presiding Justice. Glazer, Chandler v. Grob, 1939, 136 Me. 123, 3 A.2d 895; Bunker v. Gouldsboro, 1889, 81 Me. 188, at 196.

B. The .other proposed instruction which the presiding Justice refused to give to the jury read as follows:

"I instruct you that if you find that, in the exercise of due care, a person in the position of Mr. Towle would have seen the Aube vehicle prior to the collision, you must also find that an ordinary prudent driver in Mr. Towle's position should and could, as the result of such observation, have taken some action which would have avoided the accident in order to find that Mr. Towle was guilty of negligence which proximately caused the accident."

■ It readily appears plaintiff's counsel wished to have the jury informed that Towle's failure to see the Aube vehicle was not, in and of itself, a sufficient basis for a finding that the plaintiff was negligent. In testing for error in the giving of, or refusal to give, instructions, the correctness of the action of the trial court must be determined from a review of the charge in its entirety. Desmond, pro ami v. Wilson, supra; Reed v. Central Maine Power Company, 1934, 132 Me. 476, 172 A. 823. The instructions as a whole plainly demonstrate that the jury was correctly informed as to due care, negligence and proximate causation. What the Justice below failed to do was to relate the legal principles which he had correctly conveyed to the jury to the various factual contentions advanced by the parties to explain how the accident happened. Although it would have been better practice to give the requested instruction, we do recognize that the degree of amplification to be used in instructions to juries is a matter within the sound judicial control of the presiding Justice. Glazer, Chandler v. Grob, supra; Bunker v. Gouldsboro, supra.

The failure to give these requested instructions in the instant case did not constitute prejudicial reversible error.

The entry will be

Appeal denied.

All Justices concurring.

WEBBER, J., did not sit.