WERNICK, Justice.
 

 We review this case for the second time.
 

 Previously, we sustained the appeal of plaintiff, Lawrence Isaacson, from a Superior Court (Penobscot County) judgment in favor of defendant, Husson College. The judgment was entered after the jury trial of plaintiff’s civil action for damages caused by negligence of the defendant culminated in a verdict for defendant directed by the presiding Justice at the conclusion of plaintiff’s case in chief.
 

 On retrial, the jury returned a verdict awarding plaintiff damages in the amount of $12,000.00. Motions of defendant for judgment n. o. v. and for a new trial were denied. Defendant has appealed from the judgment for plaintiff entered on the verdict.
 

 We deny the appeal.
 

 The evidence supports jury findings of these facts.
 

 From Monday, February 24, 1969, to the afternoon of Wednesday, February 26,
 
 *757
 
 1969, a major storm blanketed the Bangor area, site of defendant College, with approximately 42 inches of snow. The College cancelled Wednesday’s classes. During and after the snowfall the maintenance personnel of defendant were engaged in clearing the snow from the roads and walkways of the College.
 

 Early in the evening of Thursday, February 27, 1969, plaintiff, who resided in Hart Hall, a campus dormitory, went to eat dinner in the College refectory, Carlisle Hall. He used a pathway connecting Hart and Carlisle Halls. Plaintiff had traversed this same pathway in both directions several times each day since the preceding Monday. On each of these occasions plaintiff had noticed that the walkway had been plowed bare except for some snow which had blown from the high snowbanks bordering the pathway. Plaintiff never observed any ice along his route.
 

 After plaintiff had finished his dinner and was returning to Hart Hall he suddenly lost his footing, despite his precautions of wearing rippled-soled shoes and walking in a “shuffling” manner, and fell forward injuring his right knee. When he fell plaintiff felt and saw that he had slipped on a patch of ice not previously visible to him because of the absence of illumination in the area.
 

 Plaintiff was “in extreme pain” and required assistance from several friends to enable him to return to his room. While he was returning to the dormitory, plaintiff “felt a crunching sound under [his] feet . . . like rock salt or sand.” Plaintiff recalled no such substance in the area of his fall.
 

 During the night of February 27, 1969 plaintiff administered hot and cold towels to his injured knee “ . . .to ease the pain.” Finally, on Saturday, March 1, 1969, because still suffering severe pain, plaintiff went to the Eastern Maine Medical Center. His knee was swollen, its motion restricted, and there was fluid in the knee joint (‘ either blood or synovial fluid”). X-rays revealed no bone damage. A doctor who examined plaintiff at the hospital was
 

 “ . . . sure that . . . [plaintiff] had a torn cartilage, and . was going to have to have surgery done on it.”
 

 The ultimate diagnosis was that plaintiff had sustained “a torn lateral semilunar cartilage in his right knee.”
 

 As initial therapy, plaintiff’s leg was immobilized in a cast, but the cast caused excessive pain and was removed a few days later, padding and bandages being substituted. For several weeks plaintiff used crutches.
 

 In May of 1969 plaintiff returned to his home in New York and underwent surgery on his knee. He remained immobilized in the hospital for one week. He left the hospital in a wheel chair and his right leg was immobilized for three weeks thereafter, plaintiff using crutches to assist him in moving about. Notwithstanding a long rehabilitative program, involving whirlpool treatments and weight lifting, plaintiff was left with a twenty-five to thirty percent “permanent impairment” of the right knee. His right knee continues to swell in the joint and to cause him pain whenever plaintiff engages in sports activities.
 

 1
 

 We find without merit defendant’s claim on appeal that the evidence is legally inadequate to establish that defendant is legally liable to plaintiff.
 

 Plaintiff’s testimony at the second trial was essentially as he had testified at the original trial. Our decision in Isaacson v. Husson College, Me., 297 A.2d 98 (1972) establishes, precedentially, that plaintiff’s testimony itself justifies a jury verdict of defendant’s liability. Unless other evidence was adduced at the second trial sufficient to override the force of plaintiff’s
 
 *758
 
 testimony
 
 as a matter of law,
 
 the evidence was legally sufficient to support the jury’s verdict on liability.
 

 The only additional evidence bearing on liability was given by Eugene Moore, Jr., the Director of defendant’s physical plant. He testified concerning the efforts of defendant’s maintenance personnel to cope with the storm conditions prior to and at the time of the incident causing plaintiff’s injury.
 

 Analysis of Mr. Moore’s testimony reveals that it adds weight to plaintiff’s testimony and, instead of establishing defendant’s non-liability as a matter of law, confirms that liability was for the jury to decide.
 

 This is plain from the following facts to which Mr. Moore testified. (1) Prior to the event in which plaintiff sustained his injury, the College maintenance crew had sanded the campus roads but had omitted to sand the campus walkways. (2) Lack of illumination of the walkways connecting Hart and Carlisle Halls caused the area in which plaintiff was walking when he slipped and fell to be “essentially dark.” (3) At approximately 3:00 p. m. in the afternoon of Thursday, February 27, 1969, Mr. Moore had personally toured the area at which plaintiff later sustained his injury. He then noticed that no ice had yet developed from any freezing of the melting produced by the earlier application of calcium chloride to the walkway, but there was some accumulation of blown snow. (4) After Mr. Moore’s 3:00 p. m. tour, the pathway was again cleared to remove this blown snow and additional calcium chloride was applied. (5) The entire snow maintenance crew of defendant was sent home at approximately 3:30 p. m. subject to being recalled to deal with changed conditions. (6) Only one inspector, a campus guard, was left to keep check, on an hourly basis, on changing conditions along the walkways. (7) Since the lone inspector was unable to operate the machinery necessary for snow and ice clearance, he had been given instructions to notify Mr. Moore so that Mr. Moore could then reassemble the maintenance crew to come from their homes to put down more calcium chloride or “if it was real icy, cover . . . with sand.” (8) During the evening of Thursday, February 27, 1969 the temperature turned severely cold and there were high gusting winds causing blowing snow. (9) Snow melting from the application of calcium chloride, Mr. Moore acknowledged, could quickly refreeze during a drop in temperature and be covered by blowing snow to escape the attention of a single patrolling guard. (10) Mr. Moore further acknowledged that because of the bitter cold and blowing winds which developed on Thursday evening, a quick forming of ice was reasonably to-be anticipated. (11) The lone inspector never called to report icing conditions and, hence, the maintenance crew stayed at home.
 

 The foregoing aspects of Mr. Moore’s testimony confirmed as a jury question (1) whether
 

 “the condition . . . which exposed [plaintiff] to an unreasonable risk of harm was present for a time of sufficient duration prior to the accident to enable the reasonably prudent person to discover and remedy it” Isaacson v. Husson College, supra, at p. 105,
 

 and (2) whether, within the specific analysis delineated at p. 106 of said
 
 Isaacson
 
 decision, defendant’s failure to remedy the condition was, in all the circumstances, a lack of reasonable care by defendant.
 

 2
 

 Defendant advances, as other points on appeal, alleged error in various rulings of the presiding Justice made before the case was submitted to the jury.
 

 Defendant maintains that the presiding Justice committed reversible error in excluding as evidence testimony proffered by Mr. Moore concerning the dollar amount
 
 *759
 
 of the
 
 entirety
 
 of defendant’s snow removal program.
 

 Before this ruling was made, Mr. Moore had explained in extensive detail the nature of defendant’s snow clearance efforts in general as well as on the particular occasion here involved, including relating information as to the number of personnel employed by the College for snow clearance, the type of machinery used and the procedures utilized.
 

 The dollar cost of defendant’s total snow removal program was offered as relevant to the issue of whether
 
 on the occasion in question
 
 defendant had exercised reasonable care to make the site at which plaintiff fell reasonably safe for traverse. Since the presiding Justice had permitted defendant to inform the jury fully of all that defendant had done in fact on the particular occasion, evidence as to the dollar amount of the entirety of defendant’s general snow clearance program had potential to introduce many extraneous factors likely to prolong the trial and produce more confusion than enlightenment. See: Towle v. Aube, Me., 310 A.2d 259, 265 (1973). The presiding Justice, therefore, properly exercised a discretion reposing in him to exclude the evidence because such probative value as it had was heavily overborne by its countervailing tendency to impair the orderly course of the trial. Towle v. Aube, supra; Cope v. Sevigny, Me., 289 A. 2d 682 (1972); State v. Bennett, 158 Me. 109, 179 A.2d 812 (1962). See: State v. Northup, Me., 318 A.2d 489, 493, 494 (1974).
 

 A further claim of defendant that the presiding Justice was wrong in instructing the jury that defendant had the ultimate burden of proof concerning plaintiff’s “contributory negligence”, as legally operative in the case, has been settled adversely to defendant’s position by our recent decision in Crocker v. Coombs, Me., 328 A.2d 389 (1974).
 

 Defendant also contends that the presiding Justice committed reversible error in refusing to give the jury three instructions requested by defendant.
 

 The first request sought to emphasize that the occurrence of an event causing injury to plaintiff cannot justify requiring the defendant to pay damages unless there is negligence of the defendant causing the injury to plaintiff.
 
 [1]
 

 The second and third requests for instructions stated in extensive detail legal principles as to defendant’s liability concerned with the reasonable foreseeability of a dangerous condition and the reasonableness in all the circumstances of the opportunity of the defendant to undertake reasonably careful remedial action.
 
 [2]
 

 
 *760
 
 On these matters plaintiff calls to our attention that the requested instructions were submitted for the first time only after the presiding Justice had finished his charge to the jury. Thus, says plaintiff, defendant failed to comply with Rule 51(b) M.R.C.P.,
 
 [3]
 
 and we should decline appellate cognizance of the questions raised by the denial of the requests for instructions.
 

 We conclude that it is here immaterial whether defendant met the requirements of Rule 51(b). Even if the substance of the instructions submitted by defendant are not to be evaluated as requested instructions seasonably made at the conclusion of the evidence, they are nevertheless specifications in support of objections to the charge showing respects in which the charge is claimed deficient as given.
 

 As to either posture, we find no reversible error here since we are satisfied that the charge, as given, covered the substance of the requested instructions sufficiently to inform the jury correctly, fairly and in all necessary respects of the governing principles of law.
 

 Not only as to requested instructions accompanying objections to a charge already given but also as to a refusal of the presiding Justice to give requests for instructions timely made in advance of the giving of the charge, this Court, as long ago as State v. Knight, 43 Me. 11 (1857), held that the principle governing appellate scrutiny for reversible error in this context is:
 

 “A judge, when called upon, is bound to give instructions in law which are applicable to the evidence in the case; but he is not bound to give them in the language used by the counsel making the request, nor to repeat them when requested, if once given.” (p. 141)
 

 The doctrine was soon thereafter asserted in more forceful and colorful language in State v. Smith, 65 Me. 257 (1876):
 

 “When a judge has once given the law arising upon the evidence fully and correctly, he is under no obligation to repeat the propositions at the request of a party in such form as the whim or shrewdness of counsel may suggest as likely to produce an impression favorable to his side of the case. A refusal to do this is matter of discretion, and not exceptionable.” (p. 269)
 

 Also: Towle v. Aube, Me., 310 A.2d 259 (1973); Pettengill v. Turo, 159 Me. 350, 193 A.2d 367 (1963); State v. Ernst, 150 Me. 449, 114 A.2d 369 (1955); Desmond, Pro Ami v. Wilson, 143 Me. 262, 60 A.2d 782 (1948); State v. Cox, 138 Me. 151, 23 A.2d 634 (1941).
 
 [4]
 

 
 *761
 
 3
 

 Defendant asserts as another point of appeal that the award of damages is excessive. To support this contention defendant relies, essentially, on a claim that the $12,000.00 total award is grossly disproportionate to plaintiff’s medical expenses of $1,674.70.
 

 “[DJamage assessment is the sole province of the jury and the amount fixed must stand unless it can be demonstrated that, ‘the jury acted under some bias, prejudice or improper influence, or made some mistake of law or fact.’ ” Wallace v. Coca-Cola Bottling Plants, Inc., Me., 269 A.2d 117, 122 (1970).
 

 Within this principle, a marked disparity between the medical expenses and the total damages awarded is only one of many factors to be considered and seldom, if ever, will it be controlling in itself to establish that a total award of damages is excessive as a matter of law. Here, over and above plaintiff’s medical disbursements, the evidence established that plaintiff was left with a substantial permanent impairment of his right knee and had endured much pain and suffering during a long period of convalescence and rehabilitation. Such evidence amply supported the jury’s award of damages.
 

 4
 

 Defendant’s last contention on appeal relates to a wrong answer given by a juror in response to a question asked by the Court on the voir dire examination of prospective jurors. Defendant maintains that the wrong answer deprived it of information important to “knowing” exercise of its right to challenge the juror’s participation in the case.
 

 On September 18, 1973 a voir dire examination of the panel of prospective jurors was conducted as part of the process of selecting the jurors to serve in the case at bar. In the voir dire, the presiding Justice asked the question :
 

 “Is there any member of the Jury panel who personally, or has a member of their immediate family who has ever had a claim for damages involving personal injuries ?”
 

 One prospective juror who ultimately became a juror in the case made no response to this question, thus indicating that her answer to the question was in the negative.
 

 Later, on October 9, 1973, while under voir dire interrogation in another case, she answered a similar question in the affirmative. She was then further questioned by the presiding Justice as follows:
 

 “Q. Is this a claim of your own, . . ?
 

 “A. No, my son.
 

 “Q. Did this claim result in a suit being brought ?
 

 “A. No.
 

 “Q. Was it settled to your satisfaction?
 

 “A. Yes.”
 

 The legal issue precipitated by the different responses of September 18, 1973 and October 9, 1973 was one of several questions considered by the presiding Justice in a hearing held on December 20, 1973 concerning defendant’s post-verdict motions for judgment n.o.v. and a new trial.
 

 The evidence revealed that on July 27, 1973 the juror’s son had been involved in a
 
 *762
 
 motor vehicle collision as the result of which he remained out of work for several weeks and sustained damage to his motorcycle. The juror gave as the reason for her son’s missing work that he was “lamed up.” On September 13, 1973 the boy’s father and the liability insurance carrier (of the other person involved in the collision) negotiated and agreed upon a settlement of the property losses involved. On September 21, 1973 a release was executed — the juror, as the boy’s mother, being one of the signatories — and settlement was completed with payment by the insurance company of $800.00.
 

 Thus, at the time of the voir dire on September 18th the juror knew that her son had a claim arising from a motor vehicle collision which was in process of being settled. Additionally, however, the presiding Justice was warranted in a conclusion that the juror’s failure on September 18th to give an affirmative answer to the Court’s voir dire question was not induced by a conscious purpose to deceive or mislead but was attributable to her honest misunderstanding of the exact import of the question as she conceived it to be applicable to her son’s claim. Uppermost in the juror’s mind was the thought that the settlement negotiations with the liability insurance carrier were directed to compensation
 
 only
 
 for property losses — her son’s lost wages and the damage to his motorcycle— and not for personal injury. For this reason, the juror did not on September 18, 1973, think of her son’s claim as one “for damages involving personal injuries” within the meaning of the Court’s voir dire question. The juror awoke to the realization that more might be involved when the same type of question was later put to her as an incident of the voir dire examination in another case (on October 9, 1973) because she had been
 

 “ . .
 
 . talking to some other women . , they said they didn’t know. So the next time we came in, I said yes, because I figured one way or the other, they can ask me.”
 

 It is true that, as defendant argues, we best achieve the purposes for which we alt-low litigants to challenge prospective jurors
 
 [5]
 
 if the voir dire examination of prospective jurors yields accurate and complete information. Yet, it is also inevitable that because of human failings such information will, on occasion, be innocently withheld.
 

 The problem in such instances is adequately to reconcile the interests promoted by affording an individual litigant a right to affect the make-up of a jury through the mechanism of challenges and the public interest to avoid delays and expenses not reasonably necessary to ensure a fair trial.
 

 Courts of other jurisdictions have dealt with the problem in the specific context of a juror’s withholding information under voir dire interrogation concerning previous or current injury claims, or actions, involving members of his family. The decisions reveal a large consensus of opinion that (1) a new trial is not required ipso facto because a juror innocently furnished a wrong answer to a question on voir dire which denied counsel information material to assist in his determination whether to exercise a challenge; (2) a new trial should be ordered only if such wrong answer has otherwise caused prejudice to the party seeking the new trial insofar as it prevented him from becoming aware of a bias of the juror as probably, not speculatively, existent; and (3) the presiding Justice has a large discretion in the matter, and an appellate tribunal will not reverse his decision except upon a clear showing of abuse of discretion. Maher v. New York, Chicago & St. Louis Railroad Co., 290 Ill.App. 267, 8 N.E.2d 512 (1937), cert. den. 300 U.S. 665, 57 S. Ct. 508, 81 L.Ed. 873; Pearson v. Gardner Cartage Co., 148 Ohio St. 425, 76 N.E.2d 67 (1947); Davis v. Kansas City Public
 
 *763
 
 Service Co., 361 Mo. 61, 233 S.W.2d 679 (1950); Cincinnati, Newport & Covington Railway Co. v. Peluso, Ky., 293 S.W.2d 556 .(1956); Bal Theatre Corp. v. Paramount Film Distributing Corp., D.C., 206 F.Supp. 708 (1962). But see: Marvins Credit Inc. v. Steward, D.C.Mun.App., 133 A.2d 473 (1957). See Annotations in 38 A.L.R.2d 624 and 63 A.L.R.2d 1061 for other appropriate cases.
 

 This approach reflects, in our view, a sound balancing of the benefit the “challenge” system is calculated to provide to the individual litigant and the basic societal interest that the administration of justice shall avoid delays and expenses not reasonably necessary to assure litigants a fair trial. We, therefore, adopt it.
 

 We conclude that in the instant situation the presiding Justice acted within the bounds of proper discretion in denying a new trial. The key point is that the presiding Justice was warranted in believing that the juror honestly believed, as she understood the import of the Court’s question, that her son’s claim was not “a personal injury claim.” Hence, she lacked such conscious awareness of any fundamental similarity between her son’s pending claim and the claim of the plaintiff, Isaacson, as would be reasonably likely to cause her to have a bias favoring the plaintiff, Isaacson, induced by the natural tendency of a mother to identify, and thus sympathize, with anyone who has a misfortune resembling one suffered by her own child.
 

 The presiding Justice acted with appropriate discretion in denying a new trial to defendant as sought on the ground of the juror’s wrong answer on voir dire.
 

 The entry is:
 

 Appeal denied.
 

 WEATHERBEE, J., did not sit.
 

 All Justices concurring.
 

 [1]
 

 . The requested instruction read:
 

 “Negligence may not be presumed from the mere fact that an accident or injury occurs. The mere fact that an accident happened, standing alone, does not permit a Jury to draw the inference that the accident was caused by anyone’s negligence. There must be specific proof of an act of negligence and evidence that it proximately caused the injury in question.”
 

 [2]
 

 . The second requested instruction stated:
 

 “The discharge of the duty resting upon the owner or occupier of land to exercise reasonable care for the safety of his business invitees carries with it the necessary implication that the owner or occupier shall have reasonable notice of the need for, and a reasonable opportunity to take corrective action for the safety of his invitees. The burden is upon the Plaintiff to establish that the condition of which he complains and which exposed him to an (alleged) unreasonable risk of harm was present for a time of sufficient duration prior to the accident to enable the reasonably prudent person to discover and remedy it.” The third requested instruction said:
 

 “The law in Maine is well established (Section 343 of the Restatement (Second) of Torts (1965) as follows:
 

 “ ‘A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, if but only if, he
 

 (i) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees and
 

 (ii) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
 

 
 *760
 
 (iii) fails to exercise reasonable care to protect them against the danger.’ ”
 

 “Section 343A(1) of the Restatement (Second) of Torts (1965) further states:
 

 “ ‘ (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.’ ”
 

 [3]
 

 . The provisions of Rule 51(b) M.R.C.P. here material are:
 

 “At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.”
 

 [4]
 

 . Although this principle tends to minimize the practical scope of difference, in terms of a party’s chances of prevailing on appeal, between submitting requests for instructions according to Rule 51(b) M.R.C.P. and bringing the same subject-matter to the attention of the Court by objections made after the charge has been given, full compliance with Rule 51(b) may in some instances produce benefits on appeal which will not be achieved by objections made after the charge has been given. As to essential matters dealt with in the charge only in highly generalized and abbreviated manner, the charge may be barely sufficient to withstand the kind of at
 
 *761
 
 tack raised by objections after charge — i. e., whether there has been a fatal omission to deal with essential aspects of the case,— whereas in such situation reversible error may be found if the presiding Justice has refused to give instructions seasonably requested in accordance with Rule 51(b) which contain a clear, concise and comprehensive elucidation of the correct principles of law bearing upon such critical issues of the case, thus to be plainly of significant assistance to the jury. Penny v. Atlantic Coast Line R. Co., 153 N.C. 296, 69 S.E. 238, 241 (1910); G. A. Nichols Co. v. Lockhart, 191 Okl. 296, 129 p.2d 599, 603 (1942). But see: Sauke v. Bird, 267 Minn. 129, 125 N.W.2d 421 (1963).
 

 [5]
 

 . Por a discussion of these objectives, see: United States v. Peterson, 157 U.S.App.D.C. 219, 483 F.2d 1222, 1226 (1973).