Marie BAOUST, Plaintiff-Appellant,

v.

William KRAUT, M. D. and Rafael Yanez, M. D., t/a Olmedo-Kraut Professional Associates, Defendants-Appellees.

Supreme Court of Delaware.

Submitted April 28, 1977.

Decided July 21, 1977.

C. Waggaman Berl, Jr., Wilmington, for plaintiff-appellant.

William J. Alsentzer, Jr., of Bayard, Brill & Handelman, Wilmington, for defendants-appellees.

Before DUFFY and McNEILLY, JJ., and HARTNETT, Vice Chancellor.

DUFFY, Justice:

In this medical malpractice action, plaintiff appeals from an order of the Superior Court granting summary judgment to defendants.

I

Briefly, the relevant facts are these: On October 22, 1972, plaintiff underwent a craniotomy, which is a surgical opening of the skull, at the hands of Doctors Rafael Yanez and William Kraut, both neurosurgeons. After the operation she experienced a discharge from the wound and antibiotic therapy was applied to stop the drainage. A bacteria culture taken at the time of the initial discharge did not reveal the presence of infection.

Apparently, the antibiotic therapy was not effective because the discharge recurred some weeks later and Dr. Yanez concluded that a craniectomy, the surgical removal of the bone flap inserted in the skull during the craniotomy, should be performed. The craniectomy was performed on December 7, 1972, and as a consequence of that operation plaintiff is without a portion of her skull. Thereafter, this action was filed against Doctors Yanez, Kraut and Livio Olmedo of Olmedo-Kraut Professional Associates, and the Wilmington Medical Center.* In brief, plaintiff alleges that the second operation was not necessary and that she suffered damages as a direct result of its performance.

II

Technically, the single issue to be decided in the appeal is whether the Trial Court

---

* The complaint was dismissed with prejudice by stipulation of the parties as to the Center. The Superior Court granted Dr. Olmedo's motion for summary judgment, finding that he was not connected in any way with the allegations of malpractice. That ruling is not in issue here and, accordingly, the judgment is final as to Dr. Olmedo. Our references to "defendants," therefore, are only to Doctors Yanez and Kraut.

erred in granting defendants' motion for summary judgment. In order to reach that issue, however, it is necessary to examine the underlying substantive conflict. And that involves, at the summary judgment point in the litigation, a determination as to whether there is a material issue of fact, created on the record through competent medical testimony, that is, whether the second operation, the craniectomy, was necessary.** Cf. *Hurtt v. Goleburn*, Del.Supr., 330 A.2d 134 (1974).

In support of their motion for summary judgment, defendants filed an affidavit of Dr. Martin Gibbs, a neurosurgeon, which states, in part:

"If an inflammation or infection of any nature should occur in the bone flap area of a wound healing subsequent to the performance of a craniotomy then it is acceptable practice among neurosurgeons in good standing in the Wilmington, Delaware community and in similar medical communities throughout the United States to first attempt to treat such inflammation or infection by the use of antibiotics and, if the inflammation or infection persists, to then remove the bone flap."

In a second affidavit, Dr. Gibbs stated that it was an acceptable medical practice:

". . . even in the absence of conclusive clinical evidence of infection to remove the bone flap so as to eliminate as far as medically possible the risk from any underlying but undetected bone infection and so as to insure closure of the draining opening which of itself if left open could result in serious intracranial infection by invasion from outside pathogens."

In opposition to the motion, plaintiff filed the affidavit of Dr. Allan J. Weinstein, a specialist in infectious diseases. Dr. Weinstein stated:

"5. It is my opinion, after review of the indicated records, that the question involved is whether there was ever any infection such as would justify the performance of the second operative procedure, namely, the craniectomy.

6. The culture which was taken on October 10, 1972 reveals 'coagulase negative staphylococci'. This organism is virtually never pathogenic, meaning that it seldom, if ever, requires any treatment. Thus, even the institution of antibiotic therapy at that time must be seriously questioned.

7. After the patient's discharge from the first hospitalization, drainage apparently abated and then recurred, but no cultures were taken. In the absence of such cultures, the out-patient reinstitution of antibiotic therapy must also be seriously questioned.

8. After the second admission and at surgery, there was no clinical evidence of infection. Cultures taken revealed only another non-pathogenic organism (proprionobacterium acnes). Further, pathologic examination of the resected bone flap showed no changes consistent with infection, such as osteomyeolitis.

9. Thus, it is my opinion, based upon reasonable medical probability that there is no evidence whatsoever of any infection which would justify the performance of the second operation, the craniectomy."

Relying on *DiFilippo v. Preston*, Del. Supr., 3 Storey 539, 173 A.2d 333 (1961), the Court refused to consider Dr. Weinstein's affidavit, ruling that a specialist in infectious diseases could not competently state an opinion on the question of whether a neurosurgeon satisfied the standard of care required of his specialty. Viewing the record in this context, the Court found defendants' evidence to be uncontroverted and, accordingly, granted the motion for summary judgment.

### III

In order to make out a claim of medical malpractice, plaintiff must show

** We are not concerned with whether the second operation was performed in a medically acceptable manner. Indeed, the question of negligence in the performance of the second operation has not been presented on appeal and does not appear to be an issue in the case.

that the defendant-doctors failed to exhibit "the same standards of care and competence as other surgeons in good standing ordinarily adhere to in the same or a similar community." *Id.* at 336. Since courts and juries are not skilled in the practice of medicine, expert testimony is needed, in most cases, to establish the relevant standard of care. *Christian v. Wilmington General Hospital Ass'n*, Del.Supr. 11 Terry 550, 135 A.2d 727, 730 (1957). And, certainly, it is required here where the alleged malpractice involves a decision to perform or not to perform a craniectomy. Indeed, it is generally true that where a medical specialty is involved only a like specialist may competently testify to the relevant standard of care. See *DiFilippo v. Preston*, supra, at 338, and Annot., 31 *A.L.R.*3d 1163 (1970) and cases cited therein. For a discussion on the use of expert medical testimony, see Judge Taylor's opinion in *Peters v. Gelb*, Del.Super., 303 A.2d 685 (1973) aff'd 314 A.2d 901 (1974).

But this is not true in every case because even a general practitioner with knowledge or training may be competent to give testimony about a specialty reserved to experts. See 31 *A.L.R.*3d, supra, at p. 1166. And, of more importance for present purposes, the diagnosis and treatment of some medical problems may be of concern to doctors of different specialties, and in an area of concurrent expertise, a common standard of care may be shared.

■ As we read the record, this is precisely the situation we have here with respect to the affidavits of Doctors Gibbs and Weinstein. As a specialist in infectious diseases Dr. Weinstein may not competently testify on issues of neurosurgical technique, or judgment, just as Dr. Gibbs, a neurosurgeon, may not competently testify on the proper treatment of infections unrelated to neurological disorders. But, surely, each may competently testify on the question of whether the performance of a particular neurosurgical procedure was necessary to cure or prevent a specific infection.

In his first affidavit, quoted above, Dr. Gibbs used the terms "inflammation or in-

fection" in describing the standard of care and what is to be done following a craniotomy. The words, of course, are not synonymous. The term "infection" describes the "[i]nvasion of the body by pathogenic microorganisms and the reaction of the tissues to their presence and to the toxins generated by them; . . . ." *Dorland's Illustrated Medical Dictionary* (24th ed. 1965). "Inflammation," on the other hand, is a generic term describing the reaction of tissue to injury. *Id.* Infection is often symptomatized by inflammation, but inflammation may occur without infection. The absence of pathogenic agents in the culture may indicate the nonexistence of an infection or, as Dr. Gibbs stated in his second affidavit: "The use of antibiotic therapy in and of itself may prevent cultures from showing the existence of pathogenic bacteria." On the present state of the record, we simply do not know more than that.

■ On the motion for summary judgment, plaintiff is entitled to have the record read in a manner most favorable to her and to benefit from any inferences drawn therefrom, *Mechell v. Palmer*, Del.Supr., 343 A.2d 620, 621 (1975) and, so viewed, it is at least medically possible that the diagnosis involved the existence of an infection and how to properly treat it. And that species of medical question is within Dr. Weinstein's specialty. Conversely, the pivotal issue may be one of neurosurgical judgment on the question of how to stop a non-pathogenic discharge, or what to do to close a cranial opening to prevent, in Dr. Gibbs' words, "serious intracranial infection by invasion from outside pathogens"; such issues, clearly, are not within Dr. Weinstein's specialty. In short, the critical facts are not settled by the affidavits and it cannot be said, at the summary judgment stage, that defendants are entitled to judgment as a matter of law.

We conclude from the record presently before us that the Trial Court's refusal to consider the Weinstein affidavit constituted reversible error. When that affidavit is added, there is a conflict of material fact as to whether the craniectomy was necessary.

For this reason, the judgment must be reversed and the case remanded for trial.