Cecile ROBERTS et al.

v.

Lionel TARDIF et al.

Supreme Judicial Court of Maine.

Argued Jan. 10, 1980.

Decided July 25, 1980.

Lipman, Parks & Livingston, David M. Lipman (orally), John M. Parks, Sumner H. Lipman, Augusta, for plaintiffs.

Hunt, Thompson & Bowie, M. Roberts Hunt (orally), James M. Bowie, Portland, for defendants.

Before WERNICK, GODFREY and GLASSMAN, JJ., and DUFRESNE and DELAHANTY, A. R. JJ.

GODFREY, Justice.

Dr. Tardif appeals from a judgment of the Superior Court entered on a jury verdict finding him liable for medical malpractice resulting in injury to the plaintiffs. We address the following issues raised by the appeal:. (1) whether the trial justice erred in giving an "unavoidable accident" instruction in the course of charging the jury; (2) whether certain hearsay testimony based on an x-ray report was properly elicited from an expert medical witness on direct examination; (3) whether the trial court erred in refusing to refer specifically to a community standard in defining the standard of care applicable to the obstetrical treatment of Mrs. Roberts; and (4) whether the evidence supported the court's instructions on certain elements of damage.

The plaintiffs are Cecile and Bernard Roberts, suing individually and as parents of Susan Roberts, an infant. The defendant-appellant is a specialist in obstetrics and gynecology, practicing in Lewiston, Maine.[1] The injury is a partial paralysis of Susan's left arm alleged to have been caused by the defendant's negligent treatment of Cecile Roberts before and during delivery. We sustain the appeal, vacate the judgment, and remand the case to the Superior Court.

Evidence was admitted at trial from which the jury could have rationally inferred the following facts: Cecile Roberts gave birth to Susan Roberts on December 13, 1973, at the St. Mary's General Hospital in Lewiston, Maine. Defendant Dr. Lionel Tardif was the mother's obstetrician during her pregnancy and delivery.

Over objection, the trial court permitted the plaintiffs' expert witness, Dr. Cibley, to give testimony based on what appeared to be a copy of a report of x-ray pelvimetry taken at another hospital in 1967 during an earlier pregnancy of Mrs. Roberts under the care of a different obstetrician. That report contained references to "prominent spines" and "low-normal mid-pelvic diameter". Dr. Cibley testified that a careful obstetrician who saw such references would have been alerted to possible difficulties in vaginal delivery.

Mrs. Roberts's earlier baby, weighing six pounds thirteen ounces, had been delivered vaginally, without induction, after six to eight hours of labor. Mrs. Roberts told Dr. Tardif during her pregnancy in 1973 that she felt very large and asked whether she might be having twins. After checking, he assured her that there was only one heartbeat and that many expectant mothers felt large. She testified that she told him an x-ray had been taken during her 1967 pregnancy. Dr. Tardif did not see the record of x-ray pelvimetry made during that earlier pregnancy, and he testified that he did not remember Mrs. Roberts's telling him of its existence.

Dr. Tardif planned a normal vaginal delivery. He did not himself obtain x-ray pelvimetry, which would have yielded some evidence that the baby was going to be large but would have entailed certain other, different risks of its own. In fact, the baby proved to be unusually large: eleven pounds, two ounces.

Dr. Tardif, with Mrs. Roberts's consent, induced labor by use of a drug, pitocin, which she took orally in the form of three or four pills. Mrs. Roberts said she wanted some sort of anaesthetic during the birth because she did not want to be in pain. With her consent, when labor began, Dr. Tardif ordered a spinal anaesthetic as the most effective means of assuring complete disappearance of pain. The spinal anaesthetic prevented Mrs. Roberts from pushing with her abdominal muscles but did not inhibit her uterine contractions. When the baby's head reached the vulva, Dr. Tardif used midforceps and two nurses put pressure with their arms upon Mrs. Robert's abdomen in order to bring the baby's head out. After the baby's head had emerged, the baby's left shoulder became caught on the pubic symphysis, and Dr. Tardif had to rotate its shoulders manually so that the

1. Plaintiffs' action against a second defendant, St. Mary's General Hospital, was dismissed with an order approving settlement.

posterior shoulder was delivered first and the rest of the baby followed.

Susan was born with a limp left arm. Dr. Tardif told Mrs. Roberts that he had pinched a nerve. Although he told her the arm would take care of itself, at the time of trial the child did not have full normal use of the arm, which was about half an inch shorter than the right arm.

Mrs. Roberts did not return to work but stayed home to do exercises with the baby. The arm improved, but Susan cannot lift her left arm more than eighty degrees from her body. The condition may improve or stay the same but will not get worse. Probably she will never fully recover and have the full use of her shoulder. The one-half inch discrepancy in the length of her left arm may or may not increase as she grows.

In the first count of their complaint, the plaintiffs claimed that Dr. Tardif treated Mrs. Roberts negligently by not being aware of the baby's size and the mother's "peculiar medical problems" encountered during her delivery. That count sought damages for Susan's past and future medical expenses and for the parents' past and future earnings lost while caring for Susan. A second count alleged Susan's permanent impairment and sought damages for her reduced earning capacity, past and future pain and suffering, and future medical bills.

At trial, the plaintiffs called as their chief medical witness Dr. Leonard Cibley, an experienced obstetrician and gynecologist from Waltham, Massachusetts. In effect, Dr. Cibley testified that Dr. Tardif had been negligent in failing to ascertain the size of the baby, in inducing labor with buccal pitocin, in using a spinal anaesthetic, and in using forceps. The defendant called Dr. Kenneth Doil of Portland, who testified that the treatment had been proper. The jury returned a verdict of $40,000 for Susan Roberts, $5,000 for the mother and $200 for the father. The court denied defendant's motion for a directed verdict made at the close of all the evidence, denied his motion for judgment notwithstanding the verdict, and entered judgment according to the jury's award.

## I. The "Unavoidable Accident" Instruction.

The defendant objected at trial to the so-called "unavoidable accident" instruction which the trial justice gave in the course of his charge to the jury. The critical part of the charge was as follows:

A physician or surgeon is not bound to use any particular method for treatment or operation. When physicians or surgeons of ordinary skill and learning recognize several methods of treatment as proper, the defendant may adopt any of such methods but that some other method of treatment existed or that some other physician or surgeon might have used or advised another in a different method does not of itself establish negligence or improper treatment by the defendant.

An action to recover damages for malpractice is based on the claim that the doctor named as defendant was negligent. That is, that he failed to exercise reasonable skill or care in his professional capacity, or failed to use his best judgment, and that his negligence was the proximate cause of the plaintiff's damages. In such an action plaintiff has the duty to prove by a preponderance of the evidence that the defendant in delivery of the baby failed to use reasonable care or skill, or failed to use his best judgment, and that defendant's such failure was the proximate cause of plaintiff's injuries and damage. However, in rendering medical services to a patient, a doctor does not impliedly warrant or guarantee the success of his treatment or operation sometimes called a good result. Nor does he undertake to exercise the highest possible skill or care, or the best possible judgment.

The doctor, does, on the other hand, impliedly warrant that he possesses and will exercise such professional skill and learning as reasonable, ordinarily possessed by doctors under similar or like condition, and that he will use his best judgment.

An accident is an incident that could not have been reasonably foreseen, antici-

pated, prevented or provided against. So that in this case if you find that it was purely an accident, the defendant is not liable.

On the other hand if you find that the injury to the plaintiff could have been reasonably foreseen, or anticipated, or could have been prevented or provided against, then it is not an accident but is negligence in failing to prevent or provide against the happening of the injury.[2]

The defendant argues that the quoted instructions are inconsistent and confusing. First they charge that where alternative acceptable procedures exist for treatment of a given condition, a doctor may choose one procedure without liability for resulting accidental injury even if another doctor might have chosen another acceptable procedure. However, the last paragraph seems to direct a finding of liability if the injury was "preventable", seemingly with the implication that even though the doctor competently applied an acceptable course of treatment, he was liable for an injury that he could have reasonably foreseen as possible under the chosen course of treatment if another course of treatment would probably have avoided that injury. In the circumstances of this case, it was reversible error to give this instruction.

In *George v. Guerette*, Me., 306 A.2d 138 (1973), we reversed a verdict and judgment for the defendants because the trial court had used the "unavoidable accident instruction" in its charge to the jury. The language of the instruction in *George* was almost verbatim the same as the language in the last two paragraphs of the quoted portion of the charge given in the present case. We agreed with the plaintiff in that case that the instruction had a high potential for misleading the jury into supposing that plaintiff had some burden of persuasion greater than that of proving defendant's negligence was the proximate cause of plaintiff's injury.

We said that the instruction, properly understood, merely duplicated in a misleading way the earlier instruction on the necessity of plaintiff's showing a proximately causal relationship between negligence and injury. The reference to "avoidability" of the accident, we said, may lead the jury to infer that some additional defense is available to the defendant or that some additional burden of proof or persuasion rests on the plaintiff, or to infer that the defendant is not liable even though defendant's own negligence had created a situation where injury becomes unavoidable. 306 A.2d at 142–43. This Court then concluded:

In short, we believe that the instruction contributes so little to the jury's understanding of the issues of motor vehicle negligence actions and its potential for confusion is now so great that its use must be declared to be error.

We realize that there will be fact situations in which the use of the instruction would be harmless. However, as we consider that giving of the charge is not necessary to a fair explanation of the principles involved, we feel that it is preferable to declare its use to be error rather than to leave the Justices and the litigants to the uncertainties of case by case rulings as to whether the particular facts have created a situation in which the charge may be given without danger of confusion.

306 A.2d at 144.

Not all the dangers considered in *George v. Guerette*, where it was the plaintiff who objected to the instruction, are present where it is the defendant who objects; for instance, in the present case there was no danger of giving the jury an impression that the plaintiff had some additional burden of proof or persuasion. Here, however, the instruction gave rise to a serious danger that the jury would misunderstand the very basis of the doctor's defense. A doctor is not liable for injury resulting when he pursues one of several acceptable

2. The last two paragraphs of the quoted instruction repeat almost verbatim the language we disapproved in *George v. Guerette*, Me., 306

A.2d 138 (1973) at the instance of an appellant plaintiff.

courses of treatment meeting the applicable standard of care in the circumstances, even though an alternative procedure also meeting that standard might have avoided the injury. *Downer v. Veilleux*, Me., 322 A.2d 82, 87 (1974). When the jury is instructed that the defendant is not liable if the injury is "purely accidental" but was negligent if the injury was reasonably foreseeable or preventable and he failed to provide against it, there is serious danger that the jury may reason that defendant is liable if the accident was avoidable by adoption of an acceptable alternative procedure. On the contrary, the correct rule, reflected in the first part of the quoted portion of the trial judge's instructions, is that the doctor is not liable if, all circumstances considered, he has met the applicable standard of care in his choice of procedure and in his manner of executing that procedure. Here, the danger of prejudice was acute. The testimony of plaintiffs' chief medical witness had emphasized that an alternative course of treatment, caesarian section, would probably have avoided the necessity for the use of forceps and manipulation in order to bring the large baby past the pubic symphysis that obstructed its passage. With this testimony in mind, the jury may have concluded that although, all circumstances considered, the defendant was not negligent in electing to proceed with vaginal delivery, he was nonetheless liable because the choice of a caesarian section as the method of delivery would probably not have resulted in the injury that actually occurred.

Plaintiffs argue that if it was error for the trial judge to give the so-called "unavoidable accident" instruction, the error was nonetheless harmless. In the circumstances of this case, we cannot so hold. The evidence presented a question whether the applicable standard of treatment in the circumstances required the doctor to obtain more information than he did about the size of the baby before committing himself to vaginal delivery as the procedure of choice. The evidence was conflicting as to whether Dr. Tardif induced labor by use of pitocin before the baby's head had become properly engaged for birth. The plaintiff had sought to prove that the doctor's actual execution of vaginal delivery had not met applicable standards because of his use, in the circumstances, of pitocin, spinal anaesthesia, and forceps. Because there were at least two possible grounds for finding liability, it was important that there be no doubt or confusion in the minds of the triers of fact about the exact basis of the doctor's liability and the limits of his responsibility. We cannot say from this record that the jury must certainly have acquired an accurate understanding of the "unavoidable accident" instruction from the context of the entire charge. We cannot say from the record that the evidence relating to the appropriate standards of treatment and to Dr. Tardif's liability under them was so strong as to make it unreasonable to believe that the erroneous instruction might have had an influence on the outcome.

Since the judgment of the Superior Court must be set aside and since the case may be retried, it seems desirable to comment on other rulings of the Superior Court of which defendant complains, on three other issues that seem likely to recur in the event of a new trial.

II.  *Use of the 1967 X-ray Report.*

The defendant contends that the trial judge erred in allowing a physician witness, in the course of his testimony, to refer to the contents of another physician's record which had not been authenticated or admitted in evidence. Dr. Cibley, the principal expert witness for plaintiffs, had been shown a copy of the 1967 report of x-ray pelvimetry containing the notations described earlier in this opinion. Over objection, Dr. Cibley was permitted to testify from the copy of the report as to what those notations were and what they meant and to state that the notations, if seen by a later obstetrician, would have suggested potential problems with vaginal delivery, especially of a large baby. The trial court ruled that this portion of Dr. Cibley's testimony did not amount to improper admission of hearsay evidence and that authentication of the 1967 x-ray report was unnecessary as a basis for that testimony.

Rule 703 of the Maine Rules of Evidence permits an expert to base an opinion or inference on facts or data made know to the expert at or before the hearing, and if the facts are of a type reasonably relied on by experts in the field in forming their opinion or inferences on the subject, the evidence of those facts need not itself be admissible.[3] Formerly, it seems that the expert witness was not permitted on direct examination to give hearsay testimony that such facts existed. *See Warren v. Waterville Renewal Authority*, Me., 235 A.2d 295, 303 (1967) (land damage case). However, under that former rule, the expert was subject to cross-examination concerning the underlying facts for the purpose of testing "his credibility and good faith, the accuracy and extent of his knowledge." *Id.* at 302.

Rule 705 of the Maine Rules of Evidence provides that the expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data unless the court requires otherwise, but that he may be required to disclose the underlying facts or data on cross-examination.[4] The Advisers' Note to Rule 705 says that the rule permits the expert to disclose the underlying facts or data on direct examination even though facts not admissible in evidence may be included. The Advisers' Note says, "The rule supersedes statements to the contrary in *Warren v. Waterville Urban Renewal Authority*, 235 A.2d 295 (Me. 1967)." Advisers' Note to M.R.Evid. 705: R. Field & P. Murray, *Maine Evidence*, § 705.1 (1976). Ordinarily, where the ex-

pert has based his opinion on hearsay, voir dire and cross-examination provide safeguards against the use of erroneous or unreliable data. The requirement of Maine Rule 703, that the facts forming the basis of an expert's opinion be of a type reasonably relied upon by experts in the field, tends also to assure that the hearsay thus used by the expert will be trustworthy.

■ Insofar as the 1967 x-ray report was used in the manner contemplated by Rules 703 and 705, primarily as the basis for opinion evidence by Dr. Cibley, there was no necessity for its authentication or admission in evidence. An important purpose of Rule 703 is to permit the expert to give his opinion on the basis of information from sources that are normally reliable, such as hospital records, without requiring formal presentation of those sources through the time-consuming process of authentication. *See* Advisers' Note to Rule 703, R. Field & P. Murray, *Maine Evidence* § 703.2 (1976). The trial court was correct in refusing to bar Dr. Cibley's testimony merely on the ground of lack of authentication of the 1967 x-ray report.

■ However, there was a difficulty of another sort with the use of the x-ray report in this case. There was no evidence that the defendant, Dr. Tardif, had ever seen the 1967 report, and the evidence was conflicting as to whether Mrs. Roberts had told him of its existence. There was a missing element in the proof of negligence as far as the 1967 report was concerned, not because of non-authentication of the report,

---

3. M.R.Evid. 703 provides:
    The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

4. M.R.Evid. 705 provides:
    (a) *Disclosure of underlying facts.* The expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to

disclose the underlying facts or data on cross-examination.
    (b) *Objection.* An adverse party may object to the testimony of an expert on the ground that he does not have a sufficient basis for expressing an opinion. He may before the witness gives his opinion be allowed to conduct in the absence of the jury a voir dire examination directed to the underlying facts or data on which the opinion is based. If a prima facie case is made that the expert does not have sufficient basis for his opinion, the opinion is inadmissible unless the party offering the testimony first establishes the underlying facts or data.

but because there was no testimony that Dr. Tardif had a duty, even if informed of the existence of the report, to obtain a copy of it and take the data from it into account in making his choice of procedures for treating Mrs. Roberts. Dr. Cibley never testified before the jury that applicable standards of care required Dr. Tardif, if informed of the existence of the 1967 report, to examine that report or a copy of it for purposes of treating Mrs. Roberts in 1973. That record had been made when Mrs. Roberts was under the care of a different physician, and it was maintained in a different hospital. If the jury should find that Dr. Tardif was told of the existence of the report—a disputed question in itself—it is not obvious that applicable standards of care required him to ascertain its contents. In short, it was possible for the jury to have found Dr. Tardif negligent in choosing vaginal delivery in part, at least, because he disregarded the notations in the 1967 report even though there was no expert testimony that he had a duty to obtain the report if and when its existence was made known to him.

The defendant's attorney had objected to Dr. Cibley's testifying from the report on the grounds of irrelevance and lack of authentication. It may be that the grounds so asserted did not make clear to the trial justice the deficiency noted above. Because the judgment below must be vacated because of prejudicial error in the charge, we are not called upon to determine whether defendant has foregone his right to object to the use of the 1967 report by urging the wrong grounds for its exclusion. It suffices here to point out the deficiency in plaintiffs' proof that part of Dr. Tardif's negligence lay in his failure to take into account the notations in the 1967 records.

III. *National vs. Community Standards.*

■ The defendant argues failure of proof and error in instructions regarding the standard of care applicable to the defendant's treatment of Mrs. Roberts. Contending that the correct standard is that of practice in like communities, the defendant claims that the plaintiffs' proof was insuffi-

cient to identify that standard for obstetrical treatment in Lewiston, Maine, in 1973. On that ground alone, he contends, his motions for a directed verdict and for judgment notwithstanding the verdict should have been granted. We disagree with that contention.

The plaintiffs' expert, an experienced gynecologist and obstetrician with strong hospital credentials and with credentials in the field of continuing medical education, testified that the defendant's treatment in this case did not measure up to nationally recognized standards of care. Rejecting the defendant's requested instructions emphasizing a "similar community" standard, the court directed the jury, over defendant's objection, to compare the defendant's conduct to that of reasonable and prudent physicians in the defendant's specialty under like circumstances. The court added that the particular application of that standard depended upon "circumstances of time, place, and person." We find that the plaintiffs' expert did sufficiently establish the standard of care applicable to the defendant medical specialist, and that the judge's charge adequately described that standard.

We have never required application of a strict community standard in medical malpractice cases. In cases where we have mentioned locality as a factor in stating the standard of treatment, the community factor has not been involved as an issue. *Caron v. Pratt*, Me., 336 A.2d 856, 859 (1975); *Duguay v. Pomerleau*, Me., 299 A.2d 914, 917 (1973); *Aronson v. Perkins*, Me., 233 A.2d 726, 728 (1967). In cases where the defendant was a medical specialist, we have measured his conduct according to the standard of practice among specialists in the same branch of medicine, with no reference to local differences. *Cox v. Dela Cruz*, Me., 406 A.2d 620, 622 (1979); *Downer v. Veilleux*, Me., 322 A.2d 82, 87 (1974). In the one case where this Court addressed the failure of instructions to include the locality factor, we found that directing the jury to measure the physician's exercise of care and skill against that "reasonable degree of care and skill which is ordinarily possessed by

physicians and surgeons practicing under like conditions" sufficiently charged the jury to take local circumstances into account. *Josselyn v. Dearborn*, 143 Me. 328, 340–41, 62 A.2d 174, 181 (1948).

The trial court was correct in refusing to require proof of, or give instructions specifically relating to, the standard of obstetrical care prevailing in Lewiston.[5] A medical specialist should be held to national standards of care and treatment appropriate to the specialty. Since he may hold himself out as a specialist only after certification by a national board on the basis of national examinations, his patients should have a right to expect that his performance will meet national standards. A doctor who is nationally certified and who represents himself as a specialist in a particular field of medical expertise is held to the standard of skill and knowledge normally possessed by other practitioners engaged in the same specialty. *Robbins v. Footer*, 553 F.2d 123 (D.C.Cir. 1977). *See Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788 (1970); *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976). A situation may occur in which, because needed medical supplies and equipment are lacking locally, the specialist is unable to treat the patient as efficiently as other specialists more favorably located. A specialist's difficulties in such a situation must be recognized by reference to his obligation under all the circumstances, but his conduct in such circumstances is still measured by national standards. *Cf. Josselyn v. Dearborn, supra.* The trial court concluded correctly that evidence of and instructions on community standards were unnecessary.

## IV. *Damages.*

The defendant contends that the court should have granted his motion for a directed verdict on the issue of damages recoverable by Mrs. Roberts for the value of nursing services rendered by her to her infant daughter. He argues that there was insufficient evidence from which the jury could determine the value of such services.

Mrs. Roberts testified that after the birth of Susan in December, 1973, she did not return to work but, instead, stayed at home to assist the baby with exercises that were necessary to improve the use of the child's left arm. When Mrs. Roberts returned to work in September, 1974, she obtained employment on the second shift so that she could remain at home during the day and continue the exercises and medical treatments.

A parent is entitled to recover for reasonable medical and nursing expenses incurred in treating the child's injury. *Hamlin v. N. H. Bragg & Sons*, 129 Me. 165, 151 A. 197 (1930). The value of care and nursing can be recovered even if gratuitously supplied by the parent. *Johnson v. Rhuda*, 156 Me. 370, 164 A.2d 675 (1960). *See* Annot. 90 A.L.R.2d 1323 (1963).

The defendant contends that there was insufficient proof of the reasonable value of those services. Although there was no testimony about their value, in the circumstances of this case the jury could properly consider the nature of the services and draw on their own judgment and experience in determining their reasonable value. *Large v. Williams*, 154 Cal.App.2d 315, 315 P.2d 919, 923 (1957). *See Britton v. Dube*, 154 Me. 319, 147 A.2d 452 (1958) (husband permitted to recover for the value of his work in caring for his wife; jury need not base the finding of value on particular evidence of value).

On two other points, contrary to defendant's contentions, there was sufficient support in the evidence to justify instructions permitting Susan's recovery of damages for her own permanent impairment and for future loss of earnings. The evidence was clear that she had and would continue to have some impairment in the use of her left arm. It was not error to

---

5. The plaintiffs' expert testified that obstetrical standards in Lewiston were the same as national standards because obstetricians in Lewiston received the same literature and attended the same educational meetings as specialists in that field anywhere. The defendant himself testified that he observed nationally recognized standards in attending Mrs. Roberts.

permit the jury to infer, also, some loss of earning capacity as a result of that impairment. *See Texas & P. Ry. Co. v. Duncan*, 193 S.W.2d 431 (Tex.Civ.App.1945); Annot., 18 A.L.R.3d 88, 149–55 (1968).

Finally, however, we must agree with defendant that there was no evidence that Susan herself would sustain medical expenses as a result of her injury. The only relevant testimony was to the effect that after she attained skeletal maturity at age sixteen or seventeen, further medical treatment would cease. Up to that point, those expenses would be borne by her parents. Nothing in the testimony suggested that Susan herself would incur medical expenses after coming of age. The trial court should have instructed the jury accordingly.

Because of prejudicial error in the critical part of the court's charge defining the defendant's responsibility, the judgment below must be vacated.

The entry is:

Appeal sustained.

Judgment vacated.

Remanded for new trial.

Parties to bear their own costs on appeal.

All concurring.