Carol TAYLOR and Russell Taylor

v.

Allison HILL.

Supreme Judicial Court of Maine.

Argued May 9, 1983.

Decided Aug. 26, 1983.

---

Paine & Lynch by Martha J. Harris (orally), Bangor, for plaintiff.

Gross, Minsky, Mogul & Singal, P.A. by George Z. Singal (orally), Carl F. Rella, Bangor, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, VIOLETTE and WATHEN, JJ.

GODFREY, Justice.

In February 1979, plaintiffs Carol and Russell Taylor filed a complaint in Superior Court (Penobscot County) against Dr. Allison Hill for alleged malpractice in removing Carol Taylor's right ovary. The complaint alleged that the removal left her without any ovarian tissue so that she was unable to produce estrogen. Mrs. Taylor sought damages for physical and mental suffering alleged to be caused by her inability to produce estrogen naturally and for her resultant continuing medical expenses. Mr. Taylor sought damages for loss of consortium. Sometime before the trial ended, the presiding justice granted defendant's motion to dismiss Russell Taylor's loss of consortium claim for failure to file a notice of malpractice claim pursuant to 24 M.R.S.A. § 2903 (Supp.1980). Carol Taylor's negligence claim was tried and submitted to the jury on the following two special interrogatories: (1) "Was the Defendant, Allison K. Hill, M.D. negligent in his medical care and treatment of the Plaintiff, Carol A. Taylor?" and (2) "Was the negligence of Defendant Allison K. Hill, M.D. the proximate cause of any injury to Plaintiff, Carol A. Taylor?" The jury answered yes to the first question and no to the second. Judgment was thereupon entered for defendant.

On appeal, plaintiffs contend that the presiding justice erred by dismissing Russell Taylor's loss-of-consortium action and by excluding testimony from an expert medical witness for Carol Taylor on the issues of the standard of care applicable to defendant in the circumstances and defendant's breach of that standard. We affirm the dismissal of Russell Taylor's action for loss of consortium; we vacate the judgment for defendant in Carol Taylor's action.

The operative facts may be summarized as follows. In July of 1977, Mrs. Taylor had undergone a vaginal hysterectomy and salpingo-oophorectomy (VHSO) in the course of which her left ovary had been removed. Dr. Harris, the operating surgeon on that occasion, testified that when he performed the surgery he thought he removed the entire left ovary.

Less than a year later, on April 18, 1978, Mrs. Taylor was admitted to Eastern Maine Medical Center, complaining of abdominal

pain. Defendant Dr. Hill examined her in the emergency room, made a tentative diagnosis of acute appendicitis, and operated on her that day. Doctors Brown and Chamberlain assisted with the surgery. During the appendectomy, Dr. Hill observed a growth on Mrs. Taylor's right ovary. With the concurrence of the other two doctors, he decided to remove the entire right ovary rather than attempt to do a biopsy or remove only the growth. All three doctors testified that, before removing the right ovary, they inspected the site of the left ovary and found a segment of the left ovary remaining among scar tissue. The growth on the right ovary turned out to be benign.

Mrs. Taylor testified that she suffered hot flashes soon after the surgery. In May, 1978, she was examined by Dr. Burger, who prescribed premarin, an artificial estrogen replacement, for relief of her symptoms. She testified that she has since suffered hot flashes when Dr. Burger experimented with the dosage of premarin and when she stopped taking premarin for a period of two months. She also testified that since the surgery she has suffered from depression, nervousness, vaginal dryness and lack of interest in sex. Dr. Emmanuel Friedman, an expert witness for Mrs. Taylor, testified to the causal relationship between a lack of functioning ovarian tissue and hot flashes, lack of interest in sex, and vaginal dryness. He also testified that vaginal dryness can persist despite the taking of artificial estrogen.

I. *The exclusion of Dr. Friedman's testimony on standard of care.*

Carol Taylor offered Dr. Emmanuel Friedman as an expert medical witness to testify about the standard of care applicable to Dr. Hill in this case and his breach of that standard. The following testimony had been received prior to Dr. Friedman's taking the witness stand: Dr. Hill had testified that his specialty was general surgery, that he was a fellow of the American College of Surgeons (ACS), and that to belong to that national organization, a surgeon must have a "basic number of years of training" and submit reports on fifty major surgical cases. Dr. Parker Harris, a board-certified specialist in obstetrics and gynecology, had testified that a general surgeon would be held to the same standard of care as a gynecologist when performing gynecological surgery at Eastern Maine Medical Center.

An extensive voir dire of Dr. Friedman revealed the following facts concerning his qualifications to testify about the standard of care applicable to Dr. Hill. Dr. Friedman was a general surgeon and a board-certified obstetrician-gynecologist. At the time of trial, he was a professor of obstetrics and gynecology at the Harvard Medical School and chief of obstetrics at the Beth Israel Hospital in Boston, Massachusetts. During the course of his thirty-year career, he has performed at least twenty operations a year involving general surgical procedures. He testified in the voir dire that general surgery is a specialty and that a general surgeon is held to the same standard as a gynecologist when performing gynecological surgery. He made clear that he would be testifying to the standards of care applicable to a general surgeon and that he applied that standard of care when he reviewed the actions of Dr. Hill.

Dr. Friedman was also a fellow of the American College of Surgeons, and he testified that he would be applying standards promulgated by the ACS to Dr. Hill in this case. He described the ACS as a national organization that sets standards to which its member surgeons are held and has as objectives the maintenance of those standards and the continuing education of its members. The standards are promulgated by publications, journals and teaching conventions. All fellows of the ACS receive basic information about standards of care. Furthermore, the ACS is affiliated with a joint commission on accreditation of hospitals which insures that the promulgated standards are carried out by the hospitals throughout the nation that are accredited

by that joint commission. Finally, Dr. Friedman testified that a fellow of the ACS practicing surgery in Bangor, Maine, is held to the same standard of care as one practicing in Boston, Massachusetts.

After completion of the voir dire, the trial justice refused to admit testimony of Dr. Friedman about the standard of care applicable to Dr. Hill. A review of the record reveals three possible reasons the trial justice may have had for that ruling. Each will be set forth and discussed below. None of the grounds is tenable, and we must conclude that the trial justice erroneously excluded that testimony.

■ The presiding justice based his ruling, at least in part, on a finding that Dr. Friedman neither was a general surgeon nor had practiced general surgery. Those findings are clearly erroneous. Dr. Friedman testified that he is both an obstetrician-gynecologist and a general surgeon and that he had performed at least twenty surgical operations a year involving general surgery during the course of his thirty-year career. In the face of that uncontroverted testimony, the trial justice's ruling cannot be upheld on that ground.

■ As a second ground, the trial justice apparently ruled that Dr. Friedman could not testify because he was not convinced that Dr. Friedman, being an obstetrician-gynecologist, could testify to the standard of care applicable to a general surgeon. The trial justice seemed concerned that Dr. Friedman would apply gynecological standards. That concern was unwarranted for two reasons. First, Dr. Friedman testified that he would be describing the standards of care applicable to a general surgeon. Second, a member of one specialty may testify to the standard of care applicable to another specialty as long as the witness is familiar with the standard of care and qualified to testify about it.

*Fitzmaurice v. Flynn,* 167 Conn. 609, 618–19, 356 A.2d 887, 892 (1975); *Radman v. Harold,* 279 Md. 167, 171–72, 367 A.2d 472, 477 (1977); *Siirila v. Barrios,* 398 Mich. 576, 248 N.W.2d 171 (1976). Dr. Friedman testified that he knew the standard of care applicable to a general surgeon, and the record establishes that he was qualified to testify about that standard.

■ Moreover, "the diagnosis and treatment of some medical problems may be of concern to doctors of different specialties, and in an area of concurrent expertise, a common standard of care may be shared." *Baoust v. Kraut,* 377 A.2d 4, 7 (Del.1973). That is the situation presented by this record. Not only did Dr. Friedman testify generally that a general surgeon is held to the same standard of care as a gynecologist when performing a gynecological surgery, but Dr. Harris testified that that was so at Eastern Maine Medical Center under the standards of the Center. Since the record established that gynecologists and general surgeons share a common standard of care with respect to the surgical procedure involved here, the trial justice erred by not allowing Dr. Friedman to testify on the ground that he was in a different branch of medicine than Dr. Hill. *See Baoust,* 377 A.2d at 7; *Katsetos v. Nolan,* 170 Conn. 637, 646–47, 368 A.2d 172, 178 (1976); *Chenoweth v. Kemp,* 396 So.2d 1122, 1125 (Fla. 1981); *Creasey v. Hogan,* 292 Or. 154, 164–67, 637 P.2d 114, 121–22 (1981); *cf. Fridena v. Evans,* 127 Ariz. 516, 520, 622 P.2d 463, 467 (1981) (orthopedic surgeon properly permitted to testify about standard of care applicable to a doctor of osteopathy).

Finally, the trial justice seemingly ruled that national standards would not apply to Dr. Hill because he was not a specialist and therefore Dr. Friedman could not testify because he was unfamiliar with the standard of care applicable to a Bangor general surgeon.[1] Defendant strenuously argues

---

1. *From our review of the record, it appears that the trial justice applied the "strict locality" rule to what he perceived to be a general practitioner. That rule has never been and is not now*

the rule in Maine. That generally disfavored rule provides that the conduct of a physician or surgeon must be measured solely by the standard of conduct of the medical profession in the

that the trial justice's ruling can be upheld on this ground. He bases his argument on the premise that a general surgeon is equivalent to a general practitioner and, for that reason, he would not have us apply the rule enunciated in *Roberts v. Tardiff,* 417 A.2d 444, 452 (Me.1980), that "[a] medical specialist should be held to national standards of care and treatment appropriate to the specialty." We are not persuaded by defendant's argument.

■ The instant record establishes that Dr. Hill should be held to a national standard of care as a specialist. Dr. Hill testified that he specialized in general surgery. Dr. Friedman testified on voir dire that a general surgeon, as distinguished from a general practitioner, is a specialist, adding, "He is a specialist in the area of surgery as opposed to a physician who practices general diagnostic general practice type activity."

Furthermore, Dr. Hill is a fellow of the American College of Surgeons, a national organization which sets standards of care for its member surgeons. It is clear from this record that the ACS plays an important role in setting and maintaining national standards of care for surgical specialists. "A fraternity of highly-specialized and sophisticated surgeons with national organizations committed to the dissemination of the most current medical knowledge and standards in the field should clearly be held to one common standard." *Jenkins v. Parrish,* 627 P.2d 533, 537 (Utah 1981). Where, as in this case, a doctor holds himself out as a specialist, he will be held to the same standard of care of all physicians in that specialty. *Kronke v. Danielson,* 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972); *Roberts,* 417 A.2d at 452; *Brune v. Belinkoff,* 354 Mass. 102, 109, 235 N.E.2d 793, 798 (1968); *Naccarato v. Grob,* 384 Mich. 248, 253–54, 180 N.W.2d

788, 791 (1970). Because Dr. Friedman knew the standard of care applicable to a general surgeon in the circumstances of this case and because he was qualified to testify to that standard, the trial justice erred in excluding his testimony on any ground that national standards were not applicable to Dr. Hill.

■ Defendant argues in the alternative that, because the jury found Dr. Hill to be negligent, it was harmless error to exclude Dr. Friedman's testimony about the standard of care applicable to Dr. Hill and his breach of that standard. He contends that Dr. Friedman's excluded testimony would have no effect on the jury's finding that Dr. Hill's negligence did not proximately cause any injury to Carol Taylor. "Prejudicial injury occurs only if the evidence excluded was relevant and material to a crucial issue and if it can with reason be said that such evidence, if admitted, would probably have affected the result or had a controlling influence on a material aspect of the case." *Minott v. F.W. Cunningham & Sons,* 413 A.2d 1325, 1329 (Me.1980) (*quoting Towle v. Aube,* 310 A.2d 259, 264 (Me.1973)). We cannot reasonably say that Carol Taylor's case was not prejudiced by the exclusion of her only medical expert who would testify that Dr. Hill was negligent in removing her right ovary.

■ It is true that the jury could have found that the removal of the right ovary did not in fact cause Carol Taylor's alleged injuries. If the jury had so found, Dr. Friedman's excluded testimony, as set forth in the offer of proof, would not have changed the result. However, because the jury was not specifically asked whether Carol Taylor suffered an injury, that is not the only possible explanation for the jury's differing answers to the interrogatories.

---

same locality or community. W. Prosser, *The Law of Torts* § 32, at 164 (4th ed. 1971). The rule has been widely criticized as having no relevance to the realities of modern medical practice. *See* Note, *An Evaluation of Changes in the Medical Standard of Care,* 23 Vand.L. Rev. 729, 731–41 (1970). In the instant case, we need not decide what role, if any, geography

will play with regard to the standard of care applicable to non-specialists. *See generally,* Comment, *Standard of Care for Medical Practitioners—Abandonment of Locality Rule,* 60 Ky. L.J. 209 (1971); Note, *Tort-Medical Malpractice—Michigan Abandons "Locality Rule" with Regard to Specialists,* 40 Fordham 435 (1971); Note, 23 Vand.L.Rev. *supra.*

In answering the second special interrogatory in the negative, the jury could have found either that Carol Taylor did not suffer the alleged injuries or that Dr. Hill's negligence was not the legal cause of the injuries she suffered.[2] Either finding would have been quite possible on this record. The jury could have disbelieved Carol Taylor's testimony about her injuries, for it had been considerably impeached on cross-examination. Or the jury could have decided that she had suffered injuries but that they were not caused by negligent removal of the right ovary.

The jury finding of negligence did not necessarily require a finding that Dr. Hill was negligent in removing the entire right ovary. The jury would have been warranted in finding Dr. Hill negligent for failing to read the prior surgical report concerning the VHSO performed in July of 1977 but not negligent in removing the entire right ovary in the circumstances. On that finding, even though the jury believed Mrs. Taylor's account of her symptoms, it could have rationally decided that negligent failure to read the 1977 report did not proximately cause her any injury. Lacking Dr. Friedman's testimony that Dr. Hill should have called in a specialist to do the biopsy on the growth if he felt he was not capable of doing so himself and that Dr. Hill was negligent in removing the entire right ovary, the jury may have been unable to find a type of negligence proximately causing Carol Taylor's alleged injury. We cannot say that the excluded evidence would not have had a controlling influence

on a material aspect of the case. *Towle,* 310 A.2d at 264.

## II. *The dismissal of Russell Taylor's claim for loss of consortium.*

∎ In February, 1979, Carol and Russell Taylor filed the complaint in the instant action. Before filing the complaint, Mrs. Taylor had served a notice of claim on Dr. Hill pursuant to 24 M.R.S.A. § 2903 (Supp. 1982).[3] It did not appear from Mrs. Taylor's notice of claim that her husband was claiming damages for loss of consortium.[4] Russell Taylor has never served a separate notice of that claim. In answering the complaint, Dr. Hill raised the affirmative defense that plaintiffs "failed to perform all conditions precedent required by law to entitle them to commence a medical malpractice action."[5] In July, 1980, defendant moved to dismiss Russell Taylor's claim for loss of consortium. The motion was not decided at that time. In July, 1982, defendant moved again to dismiss the husband's claim, and the trial justice granted the motion.

∎ By its own terms, section 2903 does not purport to apply to an action for all types of injury but to an action "for injuries to the person." Loss of consortium would be a form of injury but would not be, at least in a technical sense, an injury to the person. Mr. Taylor's claim, though derived from an alleged injury to the person of his wife, constitutes a distinct and separate cause of action. *See Johnson v. United*

---

2. Negligence alone on the part of an actor is not enough to impose liability. Negligence is actionable only if it proximately causes an injury to another—that is, if it "is a *substantial factor* in bringing about the harm and . . . there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in harm." *Wing v. Morse,* 300 A.2d 491, 495–96 (Me.1973).

3. 24 M.R.S.A. § 2903 provides: "No action for death or injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced until at least 90 days after written notice of claim setting forth under oath the nature and circumstances

of the injuries and damages alleged is served personally or by registered or certified mail upon the person or persons accused of wrongdoing. Any applicable statute of limitations shall be tolled for a period of 90 days from service of notice."

4. It does not even appear from her notice of claim that she *had* a husband.

5. Defendant properly raised the defense of lack of notice in his pleadings. The defense is an affirmative defense which must be raised by the pleadings; otherwise it is waived. *Dougherty v. Oliviero,* 427 A.2d 487 (Me.1981).

*States,* 496 F.Supp. 597, 601–02 (D.C.Mont. 1980); *Bly v. Skaggs Drug Centers, Inc.,* 562 S.W.2d 723, 728 (Mo.App.1978); *Gutter v. Seamandel,* 103 Wis.2d 1, 308 N.W.2d 403, 408 (1981). Technically speaking, his own action is not brought *for* an injury either to his own person or to that of his wife. If the words of the statute are given a technical meaning, he was not required by section 2903 to give the ninety-day notice because his action was not one "*for* injuries to the person."

■■■■ Yet the language in question may not have been used in a strict technical sense. In common legal parlance, for instance, the term "personal injury claim" is often used in a sense that excludes damage to property but does not exclude loss of consortium for the injured person's spouse. The context of the words "for injuries to the person" in section 2903 must therefore be examined in order to ascertain whether a technical reading of the words is consistent with the purposes of the statute. The dual purpose behind section 2903 is "helping weed out doubtful claims and encouraging the settlement of meritorious ones." *Givertz v. Maine Medical Center,* 459 A.2d 548, 550 (Me.1983). The ninety-day notice provision is intended to afford the parties a period of time during which they may negotiate arrangements for settlement or for submission of the matter to arbitrators under subchapter III of the Maine Health Security Act or to a professional malpractice advisory panel under subchapter IV of the act.

Upon being served with notice of claim by the patient, the doctor is made aware of the nature and circumstances of the injuries that will be alleged to have resulted from his treatment. Since the spouse's action for loss of consortium normally stands or falls with the patient's own action, we recognize that notice of a claim for loss of consortium would not add much to what the doctor needs to know in order to respond appropriately to either notice of claim. Neverthe-

less, the filing in court of an action for loss of consortium without the precedent ninety-day notice could have some disruptive effect on the negotiations envisioned by section 2903 by injecting into those negotiations new elements, especially elements relating to the amount of damages. To that extent, the purpose of the ninety-day waiting period is furthered by requiring that a defendant physician be given notice of a spouse's claim for loss of consortium before suit on that claim is brought.

It is not apparent why section 2903 in terms limits the type of injury for which notice of claim must be given before suit.[6] In the setting of medical malpractice litigation, the intent can hardly have been to exclude actions for property damage. Property damage claims arising out of medical malpractice are virtually nonexistent. Although claims for loss of consortium are common enough, yet no reason suggests itself for excluding them from the operation of section 2903.

Taking into account the purposes of the Maine Health Security Act, we conclude that the expression "an action for injuries to the person" should not be read as excluding an action for loss of consortium. Although such an action is not, strictly speaking, one "for injuries to the person," it derives directly from such an action (namely, the treated spouse's action for injuries to her person), and to treat it as coming within the notice requirement tends to further the purposes of the statute.

■■■ We therefore hold that for purposes of applying section 2903, the term "action for injuries to the person" should be deemed to include an action for loss of consortium. We reach that conclusion without defining the precise import of the ostensibly limiting language in section 2903.

■■■ The trial court did not err in dismissing the husband's claim for lack of the notice required by section 2903.

**6.** Neither the legislative record nor the antecedent Pomeroy Commission report sheds any light on the issue here. The Commission's draft of section 2903 used the same language.

III. *The exclusion of Dr. Boyce's testimony.*

With respect to defendant's "cross-appeal" based on alleged error of the Superior Court in excluding Dr. Boyce's testimony, suffice it to say that the considerations, discussed in Part I above, relating to Dr. Friedman's qualifications are applicable to Dr. Boyce.

The entry is:

The judgment for defendant in Carol Taylor's action is vacated.

The judgment dismissing Russell Taylor's action is affirmed.

Remanded for further proceedings consistent with this opinion.

McKUSICK, C.J., and NICHOLS, VIOLETTE and WATHEN, JJ., concurring.

ROBERTS, Justice, dissenting in part.

I join in Part I of the Court's opinion. I cannot concur, however, in Part II. In my view the record in this case exposes the unfairness of the rule established in *Givertz v. Maine Medical Center,* 459 A.2d 548 (Me. 1983). By application of the *Givertz* rule Russell Taylor's suit is dismissed without any hint of prejudice to the defendant as a result of lack of notice. *See Givertz,* 459 A.2d at 556 (Roberts, J., dissenting).

The procedural history of this case demonstrates how the *Givertz* rule undermines the legitimate function of the notice requirement as outlined in *Dougherty v. Oliviero,* 427 A.2d 487 (Me.1981). When this action was commenced the defendant did not seek relief pursuant to *Dougherty.* Rather, he simply alleged enigmatically that *plaintiffs* "failed to perform all conditions precedent required by law...." The defendant lay in wait behind that vague allegation until after the two-year statute of limitations had expired. Then, for the first time, the defendant made specific reference to Russell Taylor's failure to give notice pursuant to 24 M.R.S.A. § 2903. Clever defense counsel has turned section 2903 into "a trap for the unwary." *See*

*Erickson v. State,* 444 A.2d 345, 351 (Me. 1982) (Roberts, J., dissenting).