**Alexander D. BALAN, M.D. Defendant Below, Appellant,**

v.

**Margaret Ann HORNER, Plaintiff Below, Appellee.**

**No. 82, 1997.**

Supreme Court of Delaware.

Submitted: Dec. 2, 1997.
Decided: March 2, 1998.

---

Gilbert F. Shelsby, Jr., of Mason, Ketterman, Morgan & Shelsby, Newark, for Appellant.

Nicholas H. Rodriguez, and Noel E. Primos, of Schmittinger & Rodriguez, Dover, for Appellee.

Before VEASEY, C.J., HOLLAND and BERGER, JJ.

BERGER, Justice:

This is an appeal from a jury verdict against a doctor in a medical malpractice case. The doctor argues that the Superior Court erred, among other things, by (i) allowing a gynecologist to testify as to the standard of care required of a general surgeon; and (ii) refusing to strike the gynecologist's opinion that the standard of care had been breached, when that opinion allegedly was based only on the fact that the patient was injured during the surgery. We find that the Superior Court correctly applied the law and acted within its discretion in admitting the expert testimony. We also find no error with respect to the other rulings challenged on appeal. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Margaret Ann Horner went to the Emergency Room of the Christiana Hospital on August 27, 1991, suffering from severe abdominal pain. She was examined, given medication, and sent home. The next day, Horner went to her family doctor, who examined her and recommended that she consult with Dr. Alexander D. Balan, a general surgeon. He suspected that Horner was suffering from acute appendicitis. Balan recommended that Horner undergo a laparoscopic appendectomy as soon as possible.

Laparoscopy is a procedure that allows doctors to see inside the abdomen and perform certain surgeries without cutting open the affected area. First, a needle is inserted through the periumbilical area and the abdominal cavity is inflated with carbon dioxide

gas. The doctor then inserts a sharp, hollow instrument called a trocar into the space created by the gas pressure. Once the trocar is inserted, the doctor is able to place a laparoscope and other specially-designed instruments into the abdominal cavity. The laparoscope enables the doctor to see inside the abdomen and perform surgical and other procedures. In some cases, more than one trocar is inserted in order to perform surgery immediately below the insertion sites.

Balan successfully inserted the first trocar and, under direct vision, inserted a second one. Unfortunately, the second trocar lacerated Horner's common iliac artery. Balan did not immediately realize what he had done, but he was able to see profuse bleeding in the abdominal cavity. As a result, he converted the procedure into a laparotomy, or open surgery. Balan attempted to repair the damaged artery and also removed Horner's appendix, which was not abnormal.

After the operation, Horner suffered severe pain in her leg and Balan performed a second operation to correct a blockage in the artery that had been damaged during the laparoscopy. Horner continued to have circulation problems in her leg and she sought treatment with Dr. Bruce A. Fellows. Fellows determined that the iliac artery had been damaged by scar tissue resulting from the first operation. Fellows removed the damaged section of artery and replaced it with a two-inch Gore–Tex graft. The circulation in Horner's leg returned to normal shortly after Fellows' operation, and it has remained normal ever since.

Horner's complaint alleges that Balan committed malpractice in the performance of the laparoscopy. Horner's expert witness at trial was Dr. John M. Levinson, an obstetrician-gynecologist. Levinson used slides of different laparoscopic procedures to explain the basics of laparoscopy. He opined that it was a breach of the applicable standard of care for Balan to puncture the iliac artery while inserting a trocar under direct vision. Balan testified that his vision was obstructed by Horner's intestines and Balan's expert witness, Dr. Mark Talamini, testified that Balan dealt with an unexpected problem in an entirely reasonable and appropriate way. The jury returned a verdict in favor of Horner in the amount of $155,000.

## II. DISCUSSION

### A. Levinson's Expert Testimony

■ Balan argues that Levinson was not qualified to testify as an expert and that his testimony lacked sufficient basis to be admissible in any event. Levinson has impressive credentials as a gynecologist, but no experience or expertise in general surgery. This distinction is important, according to Balan, because there are differences in the way that gynecologists and general surgeons perform laparoscopic procedures. Levinson, himself, testified that surgeons "have a different approach and a different focus" than gynecologists. The major difference, according to Levinson, is that gynecologists use a "steering wheel" device, that is inserted in the vagina, to move internal organs out of the way and provide unobstructed vision through the laparoscope. Surgeons, by contrast, use second or third trocars for increased vision. Levinson testified that the use of the "steering wheel" is the "better" approach.

It is apparent from Levinson's testimony that there are differences in the way that surgeons and gynecologists performs laparoscopies. Those differences, however, do not impact the standard of care. Levinson repeatedly testified that, "[t]here are different techniques by different doctors of equal repute in this community. But the basic techniques and the basic no-nos are the same." Balan's focus on the "steering wheel" testimony is misplaced. Levinson never criticized Balan for using the second trocar instead of a steering wheel. Rather, he opined that Balan was negligent in the way he inserted the second trocar. This Court has recognized that, "the diagnosis and treatment of some medical problems may be of concern to doctors of different specialities, and in an area of concurrent expertise, a common standard of care may be shared."[1] The record supports the conclusion that there is a common standard of care with

1. *Baoust v. Kraut,* Del.Supr., 377 A.2d 4, 7 (1977).

respect to basic laparoscopic procedures. Accordingly, we find no abuse of discretion in the trial court's decision to qualify Levinson as an expert with respect to the performance of laparoscopies by general surgeons.[2]

Even if Levinson was qualified to testify, Balan argues that his testimony should have been stricken because Levinson's opinion was unsupported. Levinson testified that, "[I do] not know exactly where Balan put [the second trocar]. But I can say that he put it in the wrong place." Levinson explained that, "I know it was done incorrectly or we would not be here...." Levinson also testified that, on rare occasions, the insertion of the first trocar causes an injury, but that he has neither experienced nor read about a case where the insertion of a second trocar damaged a major artery. On cross-examination, Levinson admitted that he did not know where Balan inserted or aimed the second trocar.

It is settled law that "a plaintiff cannot use evidence that a medical procedure had an unusual outcome to create an inference that the proper standard of care was not exercised."[3] Balan argues that Levinson attempted to do just that. Since Levinson did not know any of the details of how or where the second trocar was inserted, he was unable to state how Balan purportedly deviated from the applicable standard of care. Instead, according to Balan, Levinson opined that Balan was negligent simply because of the unusual outcome.

In advancing this argument, Balan misconstrues Levinson's testimony. While it is true that Levinson did not know exactly where or how the second trocar was inserted, that information was not critical to his analysis. Levinson opined that, once the first trocar was successfully inserted, Balan was operating under direct vision, and should have been able to control the second trocar as accurately as if Balan were performing open surgery. Since a careful surgeon could have avoided puncturing the iliac artery, Balan's failure to do so constituted a deviation from the applicable standard of care. In sum, Levinson's opinion was based on his analysis of the circumstances of this case, not mere speculation over the cause of a bad result.[4]

## B. The Demonstrative Slides

On the first day of his trial testimony, Levinson arrived in court with a series of color slides he intended to use to illustrate his testimony. After Balan was given an opportunity to review the slides, he objected on two grounds—surprise and the fact that the slides depicted some laparoscopic procedures that were very different from the one performed on Horner. The trial court overruled Balan's objections after determining that the slides would be helpful to the jury. On appeal, Balan argues that the slides were irrelevant, misleading and highly prejudicial.

The decision whether to allow an expert to use a demonstrative aid, such as color slides, is within the trial court's discretion.[5] We find that the trial court appropriately addressed both of Balan's objections and acted within its discretion in allowing the slides to be used. The trial court responded to Balan's claim of surprise by giving his counsel an opportunity to review the slides during a lunch break. Balan has not advanced any credible argument that more preparatory time was necessary to cure any prejudice he may have suffered.

Balan's more substantial argument is based on the differences between what the

2. *Medical Center of Del. v. Lougheed,* Del.Supr., 661 A.2d 1055, 1057 (1995).

3. *Timblin v. Kent General Hospital,* Del.Supr., 640 A.2d 1021, 1024 (1994); *Thomas v. St. Francis Hospital, Inc.,* Del.Supr., 447 A.2d 435 (1982); *DiFilippo v. Preston,* Del.Supr., 173 A.2d 333 (1961).

4. We recognize that there was a dispute of fact over whether Balan's "direct vision" through the laparoscope was obstructed. Balan testified that Horner's intestines blocked his view. Levinson assumed that Balan's vision was unobstructed and he based that assumption on the fact that neither Balan's operative notes nor his discharge summary made any reference to the purported obstruction. This issue of fact was properly left for the jury to decide.

5. *McLain v. General Motors Corp.,* Del.Supr., 569 A.2d 579, 583 (1990).

slides portray and what actually happened. For example, some of the slides show the "steering wheel" device and internal views of organs that were not in any way involved in Horner's procedure. Balan contends that these slides were misleading and prejudicial. Although we understand Balan's concern about the possibility of jury confusion, we are satisfied that the trial court's limiting instruction adequately eliminated that danger. The trial court ruled:

> The next witness is going to be Dr. Levinson. As part of his testimony, he's going to use some slides that the Court has seen and has ruled upon. I've admitted that evidence, but you should understand that that presentation that's on those slides is not the precise operation that was done here, and it's different in some significant respects. But it seems to me that permitting the jury to view that will enable you to understand better the general nature of the operation. All medical people have to deal with these medical issues and sometimes it's difficult.
>
> Both sides—I'm going to give both sides leeway to show you some illustrative things. Please understand it's not an exact duplication of the operation here.

By alerting the jury to the "significant" differences between some of the slides and the actual procedure, the trial court effectively eliminated the danger of prejudice or confusion. Accordingly, we find no abuse of discretion.

### C. Horner's Medical Expenses

■ Balan also objected to the introduction in evidence of Horner's medical bills on the ground that Horner had failed to establish that those bills were fair and reasonable. We find no merit to this argument. Although there was no trial testimony on this point, it appears that there was an agreement between the parties that the medical expenses were reasonable. Horner's counsel explained to the court his understanding that the medical bills would be introduced into evidence without objection and that the only

issue was the possibility that there would be a deduction for certain charges related to Horner's initial stay at St. Francis Hospital. Balan's counsel made no comment in response to that assertion. Accordingly, we are satisfied that the medical bills were properly admitted in evidence pursuant to a stipulation by the parties.

### D. Jury Instructions as to Damages

■ Finally, Balan argues that the Superior Court improperly instructed the jury that it could award money damages to Horner for future pain and suffering "of body and mind." Balan apparently acknowledges that Horner's permanent scarring, and the fact that she must live with an artificial arterial graft, are facts that would support an award for future mental anguish, humiliation or embarrassment. He complains only that there should have been no reference to future *bodily* pain and suffering.

■ This Court will set aside a verdict based upon erroneous jury instructions if "deficiencies in the instructions given by the trial judge undermined the jury's ability to perform its duty intelligently in returning a verdict." [6] In light of the evidence, it would have been more appropriate for the Superior Court to limit its instruction on future pain and suffering to future mental pain and suffering. We are satisfied, however, that the defect in the Superior Court's instruction did not interfere with the jury's ability to perform its duty intelligently.

Based upon the foregoing, the judgment of the Superior Court is hereby AFFIRMED.

---

**6.** *Asbestos Litigation Pusey Trial Group v. Owens–Corning Fiberglas Corp.,* Del.Supr., 669 A.2d 108, 113 (1995).